# *Dubois v. Beaury*

United States Court of Appeals for the Second Circuit

May 27, 2022, Decided

21-2096-cv

**Reporter**

2022 U.S. App. LEXIS 14647 *; 2022 WL 1701497

Brian Dubois, Plaintiff-Appellant, v. Robert Beaury, individually, Ronald Moore, II, individually, Paul Czajka, individually, Town of Germantown, Defendants-Appellees.[*]

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History: [*1]** Appeal from an order and judgment of the United States District Court for the Northern District of New York (Scullin, J.).

*Dubois v. Beaury, 2021 U.S. Dist. LEXIS 141452, 2021 WL 3207101 (N.D.N.Y., July 29, 2021)*

**Counsel:** FOR DEFENDANTS-APPELLEES ROBERT BEAURY, RONALD MOORE, II, AND THE TOWN OF GERMANTOWN: LORAINE C. JELINEK (Gregg T. Johnson, on the brief), Johnson & Laws, LLC, Clifton Park, NY.

FOR DEFENDANT-APPELLEE: PAUL CZAJKA: THOMAS K. MURPHY, Murphy Burns, LLP, Loudonville, NY.

**Judges:** PRESENT: BARRINGTON D. PARKER, JOSEPH F. BIANCO, EUNICE C. LEE, Circuit Judges.

# Opinion

## SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order and judgment of the district court are **AFFIRMED**.

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Plaintiff-appellant Brian Dubois appeals from the July 29, 2021 order and judgment of the United States District Court for the Northern District of New York (Scullin, J.), dismissing his claims pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. As relevant to this appeal, Dubois brought claims under *42 U.S.C. § 1983* against defendants-appellees Robert Beaury ("Town Supervisor Beaury" or "Beaury"), Ronald Moore, II ("Town Council Member Moore"), the Town of Germantown (the "Town" and, together with Beaury and Moore, "the Town Defendants"), and Columbia County District Attorney Paul Czajka ("DA Czajka"), alleging *First Amendment* retaliation and violation **[*2]** of Dubois's *Second Amendment* rights in connection with his position as a part-time Town police officer.

According to the complaint, in May 2018, Town Supervisor Beaury and the Town Board hired a consultant to conduct a comprehensive "Management and Feasibility Study" of the Town Police Department. Dubois alleges that the study was commissioned "to create a one-sided assessment report which [the Town] intended to use as a justification for firing [Dubois] and disbanding the Germantown Police Department." App'x at 20. Dubois claims that this study was proposed by Town Supervisor Beaury as revenge for Dubois's reporting of an alleged domestic violence incident involving Beaury from years prior. As part of the study, Town Supervisor Beaury and the consultant allegedly accessed the Town Police Department office to review internal police files "without the knowledge and/or consent of either the Germantown Police Department officer-in-charge or the Germantown Police Commission." App'x at 25.

Following this alleged break-in, Dubois sent three separate emails in May and June 2018 demanding the opportunity to review the office security footage to determine who had illegally entered the premises and accessed the **[*3]** files, as Dubois claims was his right as a part-time police officer per the Town's security policy. Those requests were denied, at which point Dubois reiterated concerns via email that he had

previously expressed regarding DA Czajka's handling of DWI offenses and Beaury's alleged domestic violence. In response, Beaury and DA Czajka allegedly coordinated with each other to retaliate against Dubois by concocting a false story that he was mentally unstable and that he had access to automatic weapons. To effectuate their alleged plan, DA Czajka filed a letter with the County Court related to Dubois's pistol license. Subsequently, County Court Justice Jonathan D. Nichols *sua sponte* suspended Dubois's pistol license in a Decision and Order dated June 1, 2018. Beaury also filed a petition with the County Court to bar Dubois from accessing Town firearms, which was rejected following Dubois's motion to dismiss. On August 7, 2018, the Town adopted Local Law No. 2, abolishing its Police Department and consequently terminating Dubois's employment with the Town. Dubois then brought the instant lawsuit, alleging that his termination and pistol license revocation were retaliatory acts in violation **[*4]** of his *First* and *Second Amendment* rights.

On appeal, Dubois challenges the district court's dismissal of his *Section 1983* claims alleging *First Amendment* retaliation and violation of his *Second Amendment* rights. Dubois principally argues that the district court failed to construe the allegations of the complaint in the light most favorable to him and, therefore, erred in concluding that his claims could not survive a motion to dismiss.

We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary to explain our decision to affirm.

## DISCUSSION

### I. Standard of Review

"We review *de novo* the grant of a motion to dismiss under *Rule 12(b)(6)* . . ., accepting as true the factual allegations in the complaint and drawing all inferences in the [nonmoving party's] favor." *Biro v. Condé Nast, 807 F.3d 541, 544 (2d Cir. 2015)*. To survive a motion to dismiss, the pleadings "must contain 'enough facts to state a claim to relief that is plausible on [their] face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). However, we "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly, 550 U.S. at 555* (internal quotation marks omitted); *accord Ashcroft*

*v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Moreover, in making **[*5]** this assessment under *Rule 12(b)(6)*, we may consider "facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings[,] and matters of which judicial notice may be taken." *Samuels v. Air Transp. Loc. 504, 992 F.2d 12, 15 (2d Cir. 1993)*.

### II. *First Amendment* Claim

Dubois alleges that defendants violated the *First Amendment* when they retaliated against him for sending the emails in question. Where, as here, a public employee alleges that he was retaliated against in violation of the *First Amendment*, he must plausibly allege that "(1) his speech or conduct was protected by the *First Amendment*; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011)*.

To determine whether a public employee's speech is protected, we must ask "whether [he] spoke as a citizen on a matter of public concern.'" *Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015)* (quoting *Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)*). Therefore, the analysis of this element has two sub-questions: (1) "whether the employee spoke as a citizen rather than solely as an employee;" and (2) "whether the subject of the . . . speech was a matter of public concern." *Id.* (quoting *Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011)* (internal quotation marks omitted)). As the Supreme Court articulated in *Garcetti*, "the controlling factor" in determining whether speech was made as a public **[*6]** employee or private citizen is whether the plaintiff's "expressions were made pursuant to his [official] duties." *547 U.S. at 421*.

Here, the allegations in the complaint demonstrate that the speech at issue—namely, Dubois's emails regarding his investigation of the alleged unauthorized entry into the Police Department and the improper accessing of police files—were made "pursuant to [his] official duties."[1] *Id.* For example, in his May 30, 2018, Dubois

---

[1] As a threshold matter, Dubois argues that the emails were

stated to Town Supervisor Beaury:

> Please be advised that I had to report a breach of my office, by unauthorized personnel, to CJIS as required by our Use & Dissemination Agreement and also attached your e-mail response to mine. . . . I will also need a copy of the video, as per the policy, to conduct the investigation, as required per the camera policy. I have been directed to immediately take steps to mitigate the situation and give a full report and accounting as to the results of my investigation.

App'x at 50; *see also id.* ("Please be advised that the camera policy gives me the right to ask for the video for investigative purposes and does not give you the authority to deny it as there is no provision for that."). The email later explains that, upon **[*7]** receiving the requested information, Dubois intended to "write up [a] report and provide it to CJIS as required after the Investigation [i]n conjunction with the Police Commissioners." App'x at 51. The other emails Dubois sent contain similar language referencing that the requests were made pursuant to Police Department policy and that he was required to conduct the investigation as part of his job responsibilities. *See* App'x at 51 (May 23, 2018 email) ("[A]s per the Town of Germantown Security Policy, I would like to view the video to find out who[ ] unlawfully entered my office and how [the consultant's] portfolio got left on my desk. Please secure the tape and contact me as to how it will be delivered for my viewing under policy section II,

---

improperly considered by the district court because "no documents were incorporated by reference" in the complaint. Appellant's Br. at 11. That assertion, however, is incorrect. The complaint explicitly references and describes all of the relevant emails considered by the district court. *See, e.g.,* App'x at 25-26 (Compl. ¶ 67) (describing contents of the May 23, 2018 email); App'x at 26 (Compl. ¶ 72) (describing contents of the May 30, 2018 email); App'x at 27-28 (Compl. ¶ 79) (describing contents of the June 1, 2018 email). Moreover, the district court properly considered court documents filed in Columbia County regarding Dubois's pistol license that he explicitly referenced in the complaint and, in any event, such documents could be considered under *Rule 12(b)(6)* on the separate ground that they are public records. *Blue Tree Hotel Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).* To the extent that defendants submitted other extrinsic documents with their motion to dismiss as to which Dubois objects, there is no indication that the district court considered any documents outside the scope of *Rule 12(b)(6)*, nor does this Court rely on other extrinsic evidence in conducting its *de novo* review on appeal.

Policy Guidelines and Procedures, paragraph F."); App'x at 50 (June 1, 2018 email) ("I'm doing my job investigating this as required. The very thing I'm being evaluated for is being called into question because someone doesn't like it, but, that is what I'm mandated to do.").

In sum, even construing the allegations in the complaint most favorably to Dubois, none of the speech at issue could qualify as speech Dubois made as a private **[*8]** citizen.[2] Instead, it is clear from the complaint that the speech at issue is not protected by the *First Amendment* because Dubois made such speech "in furtherance of one of his core duties," *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York, 593 F.3d 196, 198 (2d Cir. 2010)*, it was "part-and-parcel of his concerns about his ability to properly execute his duties," *id. at 203* (internal quotation marks omitted), and it "owe[d] its existence to [his] professional responsibilities," *id. at 201* (quoting *Garcetti, 547 U.S. at 421*). Accordingly, the district court correctly determined that the *First Amendment* retaliation claim fails as a matter of law.[3]

### III. *Second Amendment* Claim

Dubois also contends that defendants "violated his *Second Amendment* rights by intentionally conspiring to bring a license suspension action that resulted in the confiscation of his personal firearms." Appellant's Br. at 18. To establish this violation, Dubois relies upon a June 1, 2018 letter DA Czajka sent to the Columbia County pistol licensing authority (namely, the Columbia County and Surrogate's Courts), attaching Dubois's emails and indicating that Dubois "appear[ed] to be despondent" and "upon information and belief, . . . [wa]s in possession of at least one automatic firearm." App'x at 49. On that same day, following receipt of that letter, Justice Nichols issued a Decision and Order suspending **[*9]** Dubois's pistol license. In addition,

---

[2] To the extent Dubois referenced in the emails his past criticism of DA Czajka's handling of DWI offenses or Town Supervisor Beaury's alleged domestic violence incident, we agree with the district court that "his speech on these matters was meant to speculate on the reason for Defendant Beaury's alleged interference with his ability to complete his job," App'x at 225-26, and does not transform what is clearly speech as a public employee into speech as a private citizen.

[3] Because we conclude that Dubois's claim fails because the statements at issue were not made as a private citizen, we need not address the district court's alternative holding that the speech did not relate to a matter of public concern.

Dubois references a separate, unsuccessful petition Town Supervisor Beaury filed thereafter to enjoin Dubois from possessing firearms owned or possessed by the Town Police Department.

We have long held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under _§ 1983_." _Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)_ (internal quotation marks omitted). Where, as here, DA Czajka did nothing more than submit a letter to Justice Nichols and Judge Richard M. Koweek of the County Court, he cannot be held to have "committed" or have been "personally involved" in the alleged deprivation. Indeed, DA Czajka did not expressly ask for Dubois's pistol license to be revoked, but instead requested that the County Court "consider this matter and . . . take such action that it deems appropriate." App'x at 49; _see generally Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997)_ (holding that a supervisor's referral of plaintiff's letters for further investigation did not establish personal involvement under _Section 1983_). Furthermore, DA Czajka could not have deprived Dubois of his license because he lacked the statutory authority to do so under _New York Penal Law § 400.00(11)_. Accordingly, Dubois has failed to plausibly state a claim for a _Second Amendment_ violation **[*10]** against DA Czajka based upon Justice Nichols's _sua sponte_ decision to suspend Dubois's pistol license and require him to surrender his guns.[4]

Similarly, Dubois's _Second Amendment_ claim cannot plausibly be based upon Town Supervisor Beaury's unsuccessful petition to enjoin Dubois's possession of town firearms. As a threshold matter, Dubois concedes that this "second County Court action personally coordinated by Supervisor Beaury did not implicate Officer Dubo[i]s' _Second Amendment_ rights because this action concerned only Officer Dubois' possession of _town_ firearms." Appellant's Br. at 19 (emphasis added). In any event, Beaury was unsuccessful in enjoining Dubois's possession of the Town firearms because, on September 14, 2018, Judge Koweek dismissed the petition. As we explained in _Mozzochi v. Borden, 959 F.2d 1174 (2d Cir. 1992)_, "the success of an attempt to deprive an individual of constitutional rights is critical to whether those rights have in fact been violated." _Id. at 1180_. Therefore, because no deprivation of Dubois's possession of firearms occurred as a result of Town

Supervisor Beaury's petition, that petition cannot form the basis of a plausible _Second Amendment_ claim against Beaury or any other defendant.

In sum, the district court properly dismissed the _Second Amendment_ claim.[5]

* * *

We have considered Dubois's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the order and judgment of the district court.

---

**End of Document**

---

[4] Dubois also alleges that Town Supervisor Beaury coordinated with DA Czajka with respect to the letter, however that claim fails for the same reasons.

---

[5] To the extent Dubois also challenges the district court's dismissal of his _Monell_ claim, we find that, because his underlying constitutional claims were properly dismissed, his _Monell_ claim also fails as a matter of law. _See_ **[*11]** _Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006)_ ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under _Monell_ was entirely correct.").

# *Kreisler v. Humane Soc'y of N.Y.*

United States District Court for the Southern District of New York

October 3, 2018, Decided; October 3, 2018, Filed

16 Civ. 8177 (LGS)

**Reporter**

2018 U.S. Dist. LEXIS 171147 *; 2018 WL 4778914

TODD KREISLER, Plaintiff, -against- THE HUMANE SOCIETY OF NEW YORK, Defendant.

**Counsel:** **[*1]** For Todd Kreisler, Plaintiff: Adam Saul Hanski, Robert Gerald Hanski, Glen Howard Parker, Parker Hanski LLC, New York, NY.

For The Humane Society of New York, Defendant: Gregg Lowell Brochin, Jacklyn Meredith Siegel, Davis & Gilbert LLP, New York, NY; Patricia Hatry, Davis & Gilbert L.L.P., New York, NY.

**Judges:** LORNA G. SCHOFIELD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LORNA G. SCHOFIELD

# Opinion

## OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

Plaintiff Todd Kreisler brings this action under *Title III of the Americans with Disabilities Act (the "ADA")*, *42 U.S.C. § 12181 et seq.*, and the New York City Human Rights Law (the "NYCHRL"), *N.Y.C. Admin. Code § 8-107(4)(a)*.[1] Defendant moves for summary judgment with respect to all of Plaintiff's claims. For the reasons below, Defendant's motion is granted to the extent that Plaintiff challenges the design of Defendant's restroom and water fountain, but is denied in all other respects.[2]

## BACKGROUND

---

[1] The Complaint also raised claims under the New York State Civil Rights Law and for common law negligence, but Plaintiff has voluntarily withdrawn those claims.

[2] Plaintiff's applications to strike are denied as moot, as none of the documents in question were relied upon in this Opinion.

The following facts are taken from the Parties' statements pursuant to Federal Rule of Civil Procedure 56.1 and the Parties' submissions on this motion.

### A. The Humane Society

Defendant is a non-profit organization that operates an animal shelter, provides veterinary services and facilitates animal adoptions. Defendant is located at 306 East 59th Street, **[*2]** New York, NY 10002 (the "Building"). The Building was built in 1900, purchased by the organization in 1959 and renovated prior to 1975. In 2013, Defendant spent $103,500 to "modernize" the Building's elevators. The Building has one entrance, which is approximately 20 inches above street level and accessible only via stairs. The Building's waiting room has built in bench seating, which is not accessible to persons in wheelchairs and is arrayed around the perimeter of the space. The reception desk where visitors to the Humane Society complete paperwork is 50.5 inches high. The Building includes a restroom for employees, which is not accessible to persons in wheelchairs. The restroom is available to non-employees only "if they are having some type of emergency" and cannot "go to use another facility." The Building once included a water fountain, but it has been removed.

Defendant also owns a building located at 313 East 58 Street, New York NY 10022, which it purchased for $6,175,000, and uses for storage and lodging for visiting doctors. As of 2013, Defendant had cash and cash equivalents of $21,474,145.

### B. Plaintiff's Visits

Plaintiff owns two cats -- Cinnamon and Coco. Plaintiff first began **[*3]** visiting the Building in approximately 2014 when Coco became ill. Plaintiff uses an electric wheelchair. During Plaintiff's first few visits, he was unable to enter the building because of the stairs; he

would alert Defendant's staff by ringing a doorbell or asking a passerby to go inside and get the receptionist. On these occasions, Defendant's staff came out to the sidewalk and retrieved Coco. Defendants provided all requested care to Coco, and charged Plaintiff for an "office visit." On Plaintiff's last two visits, in November 2016 and 2017, respectively, Plaintiff was able to enter the Building via a portable ramp put in place by Humane Society staff. Plaintiff felt "unsafe" using the ramp. Plaintiff states that his experience with Defendant "annoyed him," because it reminds him of when he could not get on buses "back in the 80s," and has affected him emotionally "to the extent where I want the same access and the same rights as everybody else."

## C. Plaintiff's Proposals

Plaintiff's expert, Michael Mitchel, offers five construction proposals to make the Building's entrance wheelchair accessible. The first two proposals entail building a vertical platform lift and a new exterior stair; [*4] each proposal is estimated to take between six and nine months to complete at a cost of over $110,000. Proposal 3 involves building an inclined platform lift and a new exterior stair. It is also estimated to cost approximately $110,000 and take six to nine months to complete. Proposal 4 requires moving the entrance door to a new location and creating an accessible switchback ramp. It is estimated to cost over $91,000, and the Building would be totally inaccessible for two or three days. Proposal 5 reconfigures the Building's existing elevator hoistway to provide a new opening to the exterior at sidewalk level; it is estimated to cost between $200,000 and $300,000.[3]

Each of the proposals requires the use of construction equipment that is likely to produce noise and dust. Each Proposal -- except Proposal 4 -- provides Defendant the option to build a temporary building entrance for an estimated cost of $10,000, thereby allowing Humane Society staff and animals to enter and exit the facility during the entirety of construction. Each Proposal also requires Defendant to secure government permits.

## LEGAL STANDARDS

### A. Summary Judgment

---

[3] Determining how long it will take to complete Proposal 5 requires further study.

Summary judgment is appropriate where the record before the court [*5] establishes that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. There is a genuine dispute as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; accord *Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113 (2d Cir. 2017)* (citations omitted). The court must construe the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *Liberty Lobby, 477 U.S. at 255*; accord *Soto v. Gaudett, 862 F.3d 148, 157 (2d Cir. 2017)* (citations omitted).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." *Fed. R. Civ. P. 56(c)(1)(A)*. "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (alteration in original); accord *Dudley v. N.Y.C. Hous. Auth., No. 14 Civ. 5116, 2017 U.S. Dist. LEXIS 157504, 2017 WL 4315010, at *14 (S.D.N.Y. Sept. 25, 2017)*.

### B. ADA

Title III of the ADA provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public [*6] accommodation." *42 U.S.C. § 12182(a)*. In order to recover under Title III of the ADA, a plaintiff must prove "(1) that she is disabled within the meaning of the ADA; (2) that defendants own, lease, or operate a place of public accommodation; and (3) that defendants discriminated against her by denying her a full and equal opportunity to enjoy the services defendants provide." *Camarillo v. Carrols Corp., 518 F.3d 153, 156 (2d Cir. 2008)* (citing *42 U.S.C. § 12182(a)*); accord *Hurley v. Tozzer, Ltd., No. 15 Civ. 2785, 2018 U.S. Dist. LEXIS 30583, 2018 WL 1087946, at *2 (S.D.N.Y. Feb. 26, 2018)*. There are two principal types of discriminatory behavior under the ADA. *See Roberts v. Royal Atl. Corp., 542 F.3d 363, 368-69 (2d Cir. 2008)*; accord *Figueroa v. Hasaki Rest., Inc., No. 17 Civ. 6521,*

*2018 U.S. Dist. LEXIS 14838, 2018 WL 798880, at *1 (S.D.N.Y. Jan. 30, 2018)*.

First, when a "public accommodation" has already made "alterations" to its facility "in a manner that affects or could affect the usability of the facility or part thereof," discrimination includes "a failure to make alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." *42 U.S.C. § 12183(a)(2)*; *see Roberts, 542 F.3d at 368*; *accord Thomas v. Ariel West, 242 F. Supp. 3d 293, 300 (S.D.N.Y. 2017)*. Under this provision, when:

> "the entity is undertaking an alteration that affects or could affect usability of or access to an area of the facility containing a primary function, the entity shall also make the alterations in such a manner that, to the maximum extent feasible, the path **[*7]** of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area, are readily accessible to and usable by individuals with disabilities where such alterations . . . are not disproportionate to the overall alterations in terms of cost and scope."

*42 U.S.C. § 12183(a)(2)*; *see Roberts, 542 F.3d at 368*; *accord Andrews v. Blick Art Materials, LLC, 268 F. Supp. 3d 381, 394 (E.D.N.Y. 2017)*.

Second, where a "public accommodation" has not already engaged in "alterations," discriminatory behavior under Title III of the ADA includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." *42 U.S.C. § 12182(b)(2)(A)(iv)*; *see Roberts, 542 F.3d at 368-69*; *accord Rogers v. Subotic LLC, No. 18 Civ. 1997, 2018 U.S. Dist. LEXIS 138985, 2018 WL 3918181, at *1 (S.D.N.Y. Aug. 16, 2018)*. Removal of an architectural barrier qualifies as "readily achievable" when it is "easily accomplishable and able to be carried out without much difficulty or expense." *42 U.S.C. § 12181(9)*; *accord Brown v. Mermaid Plaza Assocs. LLC, No. 13 Civ. 760, 2018 U.S. Dist. LEXIS 132364, 2018 WL 2722454, at *9 (E.D.N.Y. Mar. 8, 2018)*.

## C. NYCHRL

The NYCHRL makes it illegal for proprietors of "public accommodation[s] . . . directly or indirectly[ t]o refuse, withhold from or deny to such [disabled] person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." *N.Y.C. Admin. Code § 8-107(4)(1)(a)*. The NYCHRL requires that "any person prohibited by the [law] **[*8]** from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Id. § 8-107(15)(a)*.

Although the statute's language is similar to the ADA, the NYCHRL demands "an independent liberal construction analysis in all circumstances, even where state and federal civil rights laws have comparable language." *Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 31 (1st Dep't 2009)*; *see also Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009)* ("Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall.") (citing The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005)) (emphasis omitted); *accord Andrews, 268 F. Supp. 3d at 400*. The NYCHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws . . . have been so construed." *Loeffler, 582 F.3d at 278* (quoting N.Y.C. Local Law No. 85 (2005)); *see also Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75 (2d Cir. 2015)* ("[C]ourts must analyze NYCHRL **[*9]** claims separately and independently from any federal and state law claims, construing [its] provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible.'") (second alteration in original).

## DISCUSSION

For the reasons below, Defendant's motion for summary judgment is denied in substantial part.

## A. ADA Claims

Defendant raises three bases for summary judgment

with respect to the ADA claim.[4] First, the Humane Society does not constitute a place of "public accommodation" within the meaning of the ADA. Second, Plaintiff's proposals for renovating the entrance to the Humane Society are not "readily achievable" within the meaning of the ADA. Third, Plaintiff's additional alleged ADA violations do not qualify as "architectural barriers" that must be removed under the ADA. Summary judgment is denied with respect to all claims, except those that relate to the restroom and water fountain in the Building.

## 1. Place of "Public Accommodation"

The ADA "enumerates 12 categories of 'private entities' that 'are considered public accommodations.'" *Lopez v. Jet Blue Airways, 662 F.3d 593, 599 (2d Cir. 2011)*; *see also Kao v. British Airways, PLC, No. 17 Civ. 0232, 2018 U.S. Dist. LEXIS 8969, 2018 WL 501609, at \*4 (S.D.N.Y. Jan. 19, 2018)*; *accord Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544 (July 26, 1991)* (codified at 28 C.F.R. pt. 36) (interpreting *42 U.S.C. § 12181(7)(A)-(L)*). In this case, the Humane Society potentially [*10] falls into four of those twelve categories: (1) "sales or rental establishments," based on the fees associated with adopting an animal; (2) "service establishments," based on the medical care Defendant provides to pets; (3) "places of education," based on seminars held in the Building or (4) "social service center establishments," based on the care and adoption of animals. *See Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. at 35,551*.

Defendant fails to show that a jury could not reasonably find that at least one of these categories applies. Defendant argues that all of the statutory categories apply to activities for people, and specifically, that under the doctrines of statutory interpretation *ejusdem generis* and *noscitur a sociis*, the categories of service establishments and social service centers also must be interpreted to reference services provided to people, not animals. *See Yates v. United States, 135 S. Ct. 1074, 1085-86, 191 L. Ed. 2d 64 (2015)* (defining *noscitur a sociis* as "a word is known by the company it keeps," and *ejusdem generis* as "[w]here general words follow

specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words"). Defendant's position is that the term "public [*11] accommodation" is "confined to enumerated establishments that serve people, not animals."

This argument fails. The premise underlying the argument -- that Defendant "provides services to animals, not people" -- is flawed, because humans keep animals as pets. When Defendant provides medical care to a pet, the pet's owner receives a service. Likewise, a person who adopts an animal from Defendant to keep as a pet receives a service. Under the logic of Defendant's argument, shoemakers -- a paradigmatic service establishment that is mentioned in the statute -- would not qualify as a place of "public accommodation," because they provide services to shoes, not to people. *See 42 U.S.C. § 12181(7)(F)*. Such interpretation of the statute is untenable.

Defendant also argues that the Humane Society is not a "public accommodation" because,

> What a disabled person does not need to attain self-sufficiency is any caring for others, whether relatives, friends, or pets for whom he might want to assume responsibility. Pet ownership would only add to the burdens disabled people are faced with daily. To be a pet owner or pet guardian is to assume the responsibility for different living beings.

This argument also fails. The ADA's stated [*12] purpose is to ensure that "physical or mental disabilities in no way diminish[es] a person's right to fully participate in all aspects of society . . . ." *42 U.S.C. § 12101* (findings and purpose). Given this broad mandate, no basis exists for excluding disabled persons from the benefits of pet ownership. Defendant's motion for summary judgment on this issue is denied.

## 2. "Readily Achievable"

Defendant argues that summary judgment is appropriate because Plaintiff's proposals for renovating the entrance to the Humane Society are not "readily achievable" within the meaning of the ADA. This argument fails for two reasons. First, a reasonable jury could conclude that the building had been "altered," in which case the "readily achievable" standard would not apply. *See Roberts, 542 F.3d at 368*. Second, even if the "readily achievable" standard did apply, a

---

[4] Because Defendant does not argue that Plaintiff is not "disabled" within the meaning of the ADA, that element of a *prima facie* ADA case is not discussed.

reasonable jury could conclude that the renovations Plaintiff requests to the Building's entrance are readily achievable.

## a. Alteration

A reasonable jury could find that the Building had been altered and that the alteration had failed to achieve accessibility to the "maximum extent feasible." *See* *28 C.F.R. § 36.402*.

> To establish the existence of an alteration, a plaintiff fulfills his or her initial **[*13]** burden of production by identifying a modification to a facility and by making a facially plausible demonstration that the modification is an alteration under the ADA. The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration.

*Roberts, 542 F.3d at 371*; *accord* *Rosa v. 600 Broadway Partners, 175 F. Supp. 3d 191, 206 (S.D.N.Y. 2016)*. A non-exhaustive list of factors to consider in evaluating whether an alteration has been made include:
> 1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof.
> 2. The scope of the modification (including what portion of the facility or relevant part thereof was modified).
> 3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility).
>
> 4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty.

*Roberts, 542 F.3d at 370 & n.5*.

Here, a reasonable jury evaluating these factors could conclude that Defendant's $103,500 "modernization" of their elevators constituted an alteration under the ADA, as it was an expensive renovation of structural components for the purposes of improvement. **[*14]** If the elevator "modernization" was an "alteration," then the lower "readily achievable" standard would not apply; Plaintiff would need to show that "those altered areas -- and paths of travel to altered areas that 'contain[ ] a primary function' -- [were] not made readily accessible to disabled individuals 'to the maximum extent feasible.'"

*Roberts, 542 F.3d at 369* (quoting *42 U.S.C. § 12183(a)(2)*). A reasonable jury could find that Defendant's renovation had not achieved accessibility to the "maximum extent feasible," because, although the elevators were modernized, they were still inaccessible to persons in wheelchairs. A reasonable jury also could find that opening the elevators to the street was a feasible remediation, as shown in one of Plaintiffs proposals. *42 U.S.C. § 12183(a)(2)*; *see* *Roberts, 542 F.3d at 368*; *see also* *Rosa, 175 F. Supp. 3d at 208 (S.D.N.Y. 2016)* (holding that defendant's refurbishing of a historic elevator, but not bringing it into compliance with the ADA, could constitute an alteration not achieving accessibility to the maximum extent feasible).

## b. "Readily Achievable" Renovations

Summary judgment is also denied because, if a jury found that the elevator "modernization" was not an "alteration," that jury could nevertheless conclude that the renovations Plaintiff proposes are "readily achievable." **[*15]** "The term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." *42 U.S.C. § 12181(9)*. Four factors are used to determine whether an action is "readily achievable" under the ADA:

> (A) the nature and cost of the action needed under this chapter; (B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility; (C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

*Harty v. Spring Valley Marketplace LLC, No. 15 Civ. 8190, 2017 U.S. Dist. LEXIS 3418, 2017 WL 108062, at *12 n.18 (S.D.N.Y. Jan. 9, 2017)* (citing *42 U.S.C. § 12181(9)*).

In order to establish a *prima facie* showing that a "reasonable accommodation" is "readily achievable" within the meaning of the ADA, "a plaintiff bears only a

burden [*16] of production that is not a heavy one. That is, it would be enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Roberts, 542 F.3d at 370* (internal quotation marks and citations removed); *accord Valentine v. Brain & Spine Surgeons of N.Y., P.C., No. 17 Civ. 2275, 2018 U.S. Dist. LEXIS 64276, 2018 WL 1871175, at *6 (S.D.N.Y. Apr. 16, 2018)*. Once a plaintiff has made a "*prima facie* showing that a reasonable accommodation is available, . . . the risk of nonpersuasion falls on the defendant." *Roberts, 542 F.3d at 370*. This "is a fact-specific inquiry that generally does not lend itself to summary judgment." *Brown v. Cty. of Nassau, 736 F. Supp. 2d 602, 622 (E.D.N.Y. 2010)*.

Defendants argue that "[a]ll of Plaintiff's proposals for reconstructing the Building's entrance require significant and invasive construction, permits and approvals from multiple city agencies, additional drawings and study, six figure cost expenditures, and risks to the safety and health of the Humane Society's animals and operations." While that might be true, Plaintiff nevertheless has met his "not heavy" burden of production; the monetary and other costs of the proposed renovations are not so facially disproportionate to the benefits of making the Building wheelchair accessible that no reasonable jury could rule for Plaintiff. *See Roberts, 542 F.3d at 370*.

### 3. Additional Violations

Defendant seeks summary [*17] judgment with respect to the alleged ADA violations unrelated to the Building entrance -- i.e., the waiting area, bathroom, service counter and water fountain -- on the basis that Plaintiff lacks standing to bring those claims. "[O]nce a plaintiff establishes standing with respect to one barrier in a place of public accommodation, that plaintiff may bring ADA challenges with respect to all other barriers on the premises that affect the plaintiff's particular disability." *Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 188 (2d Cir. 2013)*; *accord Feltzin v. 183 S. Wellwood Ave. Corp., No. 16 Civ. 5387, 2017 U.S. Dist. LEXIS 181273, 2017 WL 6994213, at *3 (E.D.N.Y. Oct. 25, 2017)*. A barrier "affects the plaintiff's particular disability" only if "he would likely encounter" that barrier. *Kreisler, 731 F.3d at 188*.

### a. Waiting Area

Defendant argues that Plaintiff lacks standing to seek an injunction with respect to the waiting area, because the bench seating "is not for use by individuals in wheelchairs" and "there is enough space in the Building's waiting area for a wheelchair." This argument fails. The fact that the current bench seating cannot be used by persons in wheelchairs is precisely the ADA violation that Plaintiff is challenging. *See* U.S. Dep't of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities § III-7.5175 ("At least five percent of fixed [*18] or built-in seating or tables must be accessible."); *see also Noel v. N.Y.C. Taxi & Limousine Comm'n, 687 F.3d 63, 69 (2d Cir. 2012)* ("[T]he Technical Assistance Manual of the Department of Justice. . . [] is persuasive authority as to the ADA's meaning, unless it is plainly erroneous or inconsistent with the ADA's regulations."). Likewise, the parties dispute whether the waiting area complies with the space requirements of the ADA, *see* 36 C.F.R. pt. 1191, app. B ("Wheelchair spaces complying with 802.1 shall be provided in accordance with Table 221.2.1.1."). According to Plaintiff's expert, the waiting room cannot accommodate a wheelchair without blocking lanes of traffic. Summary judgment is therefore denied as to the waiting area claims.

### b. Restroom

Plaintiff does not have standing to challenge the restroom, because it is an "employees only" facility, which does not raise a barrier that he "would likely encounter" upon further visits to the Building. *Kreisler, 731 F.3d at 188*; *see also Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1048 (9th Cir. 2008)* ("[T]he exclusion of a disabled plaintiff from an employees-only restroom does not violate the ADA."); *Kindle v. Fifth Third Bank, No. 14 Civ. 6502, 2015 U.S. Dist. LEXIS 115970, 2015 WL 5159890, at *3 (N.D. Ill. Sept. 1, 2015)* ("Although Fifth Third Bank is a place of public accommodation, its employees-only restroom is not.").

Plaintiff argues that there is a dispute as to whether the restroom is restricted to employees, and therefore [*19] whether Plaintiff "would likely encounter" a problem using it. In support of this argument, Plaintiff points to the deposition of Joseph Fischer, an employee at the Humane Society. But the deposition does not support Plaintiff's argument; Fischer states that non-employees are permitted to use the employee restroom only "if they are having some type of emergency" and cannot "go to use another facility." A reasonable jury could not

conclude that Plaintiff is "likely" to encounter an "emergency" situation in which he is permitted to use the bathroom at the Building but cannot do so because of his disability. Summary judgment is granted to Defendant with respect to the restroom.

### c. Service Counter

In contrast to the restroom, Plaintiff is likely to use the service counter upon further visits to the Humane Society, and therefore has standing to challenge it. Defendant argues to the contrary that "Plaintiff has not been hindered in any way by the height of the service counter, as he has paid his bill, filled out forms and provided information to Humane Society staff upon each of his visits." This argument fails, because Plaintiff's ultimate ability to work around an ADA violation in order **[*20]** to interact with the receptionist does not nullify an ADA violation that denies him "equal enjoyment" of the facility. See *42 U.S.C. § 12182(a)*.

Second Circuit precedent "does not stand for the proposition that so long as a disabled individual is permitted to shop (or eat), she cannot have suffered injury under the ADA." *Camarillo v. Carrols Corp., 518 F.3d 153, 158 (2d Cir. 2008)*; *accord Heard v. Statue Cruises LLC, No. 16 Civ. 1079, 2017 U.S. Dist. LEXIS 98665, 2017 WL 2779710, at *4 (S.D.N.Y. June 26, 2017)*. Summary judgment is warranted only "where all the evidence in the record demonstrates that the defendants have taken all necessary steps 'to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals.'" *Camarillo, 518 F.3d at 158* (quoting *42 U.S.C. § 12182(b)(2)(A)(iii)*). Here, nothing in the record suggests that Defendant has provided a service counter accessible to persons in wheelchairs. Summary judgment is denied as to the service counter.

### d. Water Fountain

Summary judgment is granted with respect to the water fountain. Defendant states that it has removed the water fountain, rendering the issue moot. Plaintiff "den[ies] information and knowledge sufficient to form a belief" about the water fountain, but points to nothing in the record suggesting that the water fountain is still on the premises and raises no argument about it. As there is no evidence **[*21]** in the record from which a reasonable jury could conclude that the Building still has a water fountain, summary judgment is granted on this issue.[5]

## B. NYCHRL

Defendant raises two arguments with respect to Plaintiff's New York City claims. First, that it is entitled to summary judgment with respect to Plaintiff's NYCHRL claims because the Humane Society is not a place of public accommodation and it provided reasonable accommodations. Second, even if summary judgment is not appropriate with respect to the NYCHRL claims, it should be granted to Defendant with respect to damages. For the reasons below, summary judgment is also denied with respect to the NYCHRL claims.

### 1. Public Accommodation

Defendant argues that it is entitled to summary judgment on Plaintiff's claims under the NYCHRL, because "the Humane Society is not a public accommodation" and it "more than reasonably accommodated Plaintiff." As this argument fails with respect to the ADA, it must also fail with respect to the NYCHRL, which offers broader protection than does the ADA. See *Loeffler, 582 F.3d at 278* (describing the ADA as "a floor below which the City's Human Rights law cannot fall.") (citations and emphasis omitted). The motion for summary **[*22]** judgment is denied.

### 2. Damages

Summary judgment is also denied with respect to damages. The NYCHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." *N.Y.C. Admin. Code § 8-130*; *accord E.E.O.C. v. Bloomberg L.P., 29 F. Supp. 3d 334, 340 (S.D.N.Y. 2014)* (applying the NYCHRL). The NYCHRL allows for compensatory

---

[5] For the same reasons, Plaintiff also lacks standing to challenge the restroom and water fountain under the NYCHRL. See *Phillips v. Pizza, No. 17 Civ. 6112, 2018 U.S. Dist. LEXIS 80922, 2018 WL 2192189, at *2 (S.D.N.Y. May 14, 2018)* ("[D]efault judgment is granted as to the ADA claims relating to the step, but denied as to the other alleged barriers. The result is the same for Plaintiff's claims under the NYSHRL and NYCHRL.")

damages for mental injuries. *See Duarte v. St. Barnabas Hosp., No. 15 Civ. 6824, 341 F. Supp. 3d 306, 2018 U.S. Dist. LEXIS 158052, 2018 WL 4440501, at *9 (Sept. 17, 2018)*. "Mental injury may be proved by the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *N.Y.C. Transit Auth. v. State Div. of Human Rights, 78 N.Y.2d 207, 577 N.E.2d 40, 45, 573 N.Y.S.2d 49 (N.Y. 1991)*; *accord Grella v. Avis Budget Grp., Inc., No. 14 Civ. 8273, 2016 U.S. Dist. LEXIS 19248, 2016 WL 638748, at *6 (S.D.N.Y. Feb. 11, 2016)* (applying the NYCHRL). In such cases, "The New York City Human Rights Commission has deemed awards of $1,000 to be sufficient in cases where complainants did not establish any particular damage 'other than what a decent and reasonable individual would suffer when faced with such ignorant behavior.'" *Kreisler v. Second Ave. Diner Corp., No. 10 Civ. 7592, 2012 U.S. Dist. LEXIS 129298, 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012)* (quoting *Okoumou v. Cty. Recovery Corp.*, 2009 WL 6910263, at *2 (N.Y.C. Com. Hum. Rts. June 1, 2009)). Larger compensatory damages are justified when the conduct is more flagrant. *See Kreisler, 2012 U.S. Dist. LEXIS 129298, 2012 WL 3961304, at *14-15* (citations omitted) (applying the NYCHRL and collecting cases).

Here, a reasonable jury could conclude that Plaintiff suffered mental anguish that **[*23]** is as acute as "what a decent and reasonable individual would suffer" under the circumstances. *Id.* at 14. In his deposition, Plaintiff stated:

> Well, in terms of -- emotional distress. I don't have -- if you mean have I suffered any emotional -- injury from where I've seen a doctor, no, but I've been injured in a sense that I haven't been able to access a place freely like everyone else. . . . I want to be able to go into a place. It's like when I was younger, having to get on a bus and back in the 80's, I couldn't get on a bus either but you -- sooner or later, you have to take a stand to it but as far as emotional injury, I wouldn't -- I mean I don't think -- I think it's affected me only to the extent where I want the same access and the same rights as everybody else.

A reasonable jury could credit that testimony and determine that Plaintiff is entitled to compensatory damages.

With respect to punitive damages, "the standard for determining damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Chauca v. Abraham, 885 F.3d 122, 124 (2d Cir. 2018)* (quoting *Chauca v. Abraham, 30 N.Y.3d 325, 67 N.Y.S.3d 85, 89 N.E.3d 475, 481 (N.Y. 2017))*. This **[*24]** standard requires "a lower degree of culpability" than is required for punitive damages under other statutes, as it "requires neither a showing of malice nor awareness of the violation of a protected right." *Id.* (quoting *Chauca, 89 N.E.3d at 481*). In this case, a reasonable jury could conclude that Defendant met this "lower degree of culpability" by acting with a "conscious disregard of the rights of others" in failing to comport with the NYCHRL. Defendant's motion for summary judgment as to the NYCHRL claims is therefore denied.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED to the extent it challenges the design of the Building's restroom and water fountain, but is DENIED in all other respects. The Clerk of Court is directed to close the motion at Docket No. 59.

Dated: October 3, 2018

New York, New York

/s/ Lorna G. Schofield

LORNA G. SCHOFIELD

UNITED STATES DISTRICT JUDGE

# *Mendez v. Apple Inc.*

United States District Court for the Southern District of New York

March 28, 2019, Decided; March 28, 2019, Filed

18 Civ. 7550 (LAP)

**Reporter**

2019 U.S. Dist. LEXIS 110640 *; 2019 WL 2611168

HIMELDA MENDEZ, on behalf of herself and all others similarly situated, Plaintiffs, -against- APPLE INC., Defendant.

**Counsel:** **[*1]** For Himelda Mendez, on behalf of herself and all others similarly situated, Plaintiff: Joseph H Mizrahi, Cohen & Mizrahi LLP, Brooklyn, NY.

For Apple Inc., Defendant: Allison Millie Warner, Gary Drew Friedman, LEAD ATTORNEYS, Weil, Gotshal & Manges LLP (NYC), New York, NY.

**Judges:** LORETTA A. PRESKA, Senior United States District Judge.

**Opinion by:** LORETTA A. PRESKA

# Opinion

ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Plaintiff Himelda Mendez ("Plaintiff") brings this class action against Apple Inc. ("Defendant") alleging violations of the Americans with Disabilities Act ("ADA"), the New York State Human Rights Law, the New York State Civil Rights Law, and the New York City Human Rights Law. Plaintiff is legally blind and makes her discrimination claim based on an allegation that Defendant has denied her full and equal access to its website, and as a result, its physical stores. Defendant has moved to dismiss the claims under *Rules 12(b) (1)* and *12(b) (6) of the Federal Rules of Civil Procedure*. For the reasons discussed below, the Defendant's motion is granted.

I. FACTS

Plaintiff Himelda Mendez is a visually-impaired and legally blind person who needs screen-reading software

to perceive website content using her computer. (Complaint (Compl.), dated Aug. 19, 2018 [dkt. **[*2]** no. 1] at ¶ 2). Defendant Apple Inc. is an electronics manufacturer and retailer that operates physical stores, as well as a website. (Compl. at ¶ 21).

Plaintiff visited Defendant's website on separate occasions using screen-reading software. (Id. at ¶ 26). During her visits to the website, Plaintiff alleges she encountered multiple access barriers. (Id. at ¶ 27). The Complaint identifies four alleged barriers: 1) "Lack of Alternative Text", 2) "Empty Links That Contain No Text", 3) "Redundant Links", and 4) "Linked Images Missing Alt-text". (Id. at ¶ 28). These barriers allegedly denied Plaintiff full enjoyment of the facilities, goods, and services of Defendant's physical locations by preventing her from accessing information about store locations and hours and inhibiting her ability to browse and purchase electronics, as well as her ability to make service appointments online. (Id.)

II. LEGAL STANDARD

Under *Rule 12(b)(1)*, a party may move to dismiss claims for lack of subject matter jurisdiction. *Fed. R. Civ. P. 12(b)(1)*. A plaintiff asserting subject matter jurisdiction has the burden of proving that it exists by a preponderance of the evidence. *See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)*. "[I]n resolving a motion to dismiss for lack of subject matter jurisdiction **[*3]** under *Rule 12(b)(1)*, a district court . . . may refer to evidence outside the pleadings." *See Makarova, 201 F.3d at 113* (citing *Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986))*.

To survive a defendant's *Rule 12(b)(1)* motion to dismiss, a plaintiff must allege facts that affirmatively and plausibly suggest that he or she has standing to sue. *Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011)*. That is because under Article III of the Constitution, federal courts can resolve only "cases" and "controversies". *U.S. Const. art. III § 2*. To establish standing "a plaintiff is constitutionally required to have suffered (1) a concrete, particularized, and

actual or imminent injury-in-fact (2) that is traceable to defendant's conduct and (3) likely to be redressed by a favorable decision." *Amidax Trading Grp., 671 F.3d at 145*.

III. DISCUSSION

a. Federal Claims

Plaintiff bears the burden of establishing the elements of standing because she invokes federal jurisdiction by bringing a claim under the ADA. 42 U.S.C. 1281 et seq.; *Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016)*. She has not met this burden because she has not pleaded an injury in fact.

The Complaint boils down to Plaintiff's allegation that general and systemic barriers on Defendant's website prevented her both from accessing goods and services on the website, as well as accessing goods and services in Defendant's physical stores. (Compl. at 8-10).

There are no injuries in fact pleaded because the purported injuries described lack all the requisite [*4] specificity. Cf., Lawrence Feltzin v. Triangle Properties #1, LLC, 14-CV-5131 at 10 (E.D.N.Y. Dec. 15, 2016) (finding that plaintiff provided "no details at all concerning any instance in which he allegedly encountered a violation," relying on plaintiff's failure to list any particular businesses he frequented or in which he encountered a violation). Plaintiff does not give a date that she tried to access the physical store or what good or service she was prevented from purchasing. She does not identify sections of the website she tried to access but could not. Finally, while general barriers are listed, she does not allege which one of them prevented her from accessing the store.

In response to Defendant's arguments, Plaintiff says that she suffered a concrete injury and points to a date, now July 2018,[1] that she last tried to access the website and encountered barriers. (Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion To Dismiss ("Pl. Opp."), dated Dec. 3, 2018 [dkt. no. 19], at 10). Plaintiff points to her "thwarted efforts to use the subject website to browse for products, and relevant information." (Id.) This leads Plaintiff to make the interesting claim that she [*5] was "unable to independently determine what information is contained within the Website." (Plaintiff's Memorandum Of Law In

---

[1] This date is inconsistent with the date listed in the Complaint, August 2018. (Compl. at ¶ 27).

Response To Defendant's Motion To Dismiss Plaintiff's Complaint ("Pl. Sur Rep."), dated Dec. 31, 2018 [dkt. no. 21-1], at 12).

The argument goes that "because disabled plaintiffs are not required to attempt to enter a physical store that is inaccessible, it is logical that Plaintiff does not need to detail a specific circumstance in which she attempted to do so." (Id. at 13-14). The unstated but logical conclusion of the Plaintiff's argument is that because in the digital world the legally blind cannot know what they are being denied access to, the pleading standard for injuries in fact is more lenient.

Plaintiff's argument relies on the "futile gesture" language of the ADA. The ADA says that an individual with a disability does not have to "engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions." *42 U.S.C. § 12188(a)(1)*. This Circuit has not settled upon a clear definition of "actual notice," but the majority of cases suggests that the plaintiff must personally witness the alleged accessibility [*6] issue. *Lowell v. Lyft, Inc., 352 F. Supp. 3d 248, 255 (S.D.N.Y. 2018)*. As the court in Lowell noted, however, "[u]nlike accessibility conditions in a building, an individual cannot personally observe the objectionable conditions in Defendant's service without downloading the application, requesting [the service], and being refused." *Lowell, 352 F. Supp. 3d at 256*.

The Court does not accept an analogy to Lowell or Plaintiff's argument because she overstates the difficulty of pleading the requisite injury. Defendant is not selling an obscure product from a hidden bunker; Plaintiff is clearly aware of Defendant's physical stores and products. In Lowell, plaintiff made bi-monthly trips to New York City from Westchester County and used defendant's transportation services to do so. *Lowell, 352 F. Supp. 3d at 252*. No such facts are alleged here.

If Plaintiff wanted one of Defendant's products or services at a particular date but was frustrated by Defendant's barriers, surely she could have pointed to something more specific than what is given. For instance, when Plaintiff says she could not make a service appointment (Compl. at ¶ 27), she could have alleged that she actually owned a device that she wanted to have serviced. This is not to say that there is a "'customer' requirement as Plaintiff construes it citing [*7] to *PGA Tour, Inc. v. Martin, 532 U.S. 661, 679, 121 S. Ct. 1879, 149 L. Ed. 2d 904 (2001)*, but rather speaks to the vagueness of the Complaint.

Device servicing generally is contingent on device ownership or possession.

Plaintiff cites to a number of cases that are easily distinguishable. In *Gathers v. 1-800-Flowers.com, Inc., 2018 U.S. Dist. LEXIS 22230, 2018 WL 839381 (D. Mass. Feb. 12, 2018)*, the district court found an injury in fact was pleaded when plaintiffs could not locate and read error messages, encountered pictures of items for sale without matching written descriptions, and were unable to locate where to input payment information to complete an online purchase. *Gathers v. 1-800-Flowers.com, Inc., No. 17-CV-10273-IT, 2018 U.S. Dist. LEXIS 22230, 2018 WL 839381, at *4 (D. Mass. Feb. 12, 2018)*.

The complaint in <u>Gathers</u> contains all sorts of detailed factual allegations. For instance, one plaintiff "attempted to order Fancy Floral Popcorn Tins" but was unable to locate the appropriate field to enter his payment information. (Amended Complaint, dated May 5, 2017 [dkt. no. 20 in 17-CV-10273], at 11. The same plaintiff tried to purchase a "Hammered Silver Cross Necklace" but could not use his screen reader program to exit the registration process. (<u>Id.</u> at 11). He entered an incorrect credit card number but was not prompted to correct the information. (<u>Id.</u>) Another plaintiff who wanted to buy flowers for his family and friends was unable **[*8]** to do so because, among other things, multiple buttons on the website were missing proper labels, which prevented the plaintiff from knowing the next steps after clicking the button. (<u>Id.</u> at 9). This is all to say that the Amended Complaint in <u>Gathers</u> reads like Balzac when compared with the instant Complaint.

Plaintiff cites to *Bernstein v. City of New York, 621 F. App'x 56 (2d Cir. 2015)* and *Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 186-87 (2d Cir. 2013)*, which are equally unavailing. In <u>Bernstein</u>, the Court of Appeals reviewed a determination that the plaintiff had not sufficiently pleaded that the City of New York failed to comply with the ADA by failing to make Central Park accessible to the legally blind. *Bernstein, 621 F. App'x at 57*. While the court found that the allegations were "not a model of specificity," it concluded that the injury alleged was personal and not generalized for standing purposes. *Bernstein, 621 F. App'x at 58*. The plaintiff alleged that he could not enter Central Park on his own and had to rely on strangers to cross streets, pathways, or ramps in the Park. <u>Id.</u> He pointed to a particular place, *i.e.*, Central Park, and particular things he was not able to do, *e.g.*, cross streets. The allegations, which the court noted were on the skimpier side, were still

more than Plaintiff's Complaint here.

Kreisler is equally inapposite. In that case, there **[*9]** was a particular "seven to each-inch step" that prevented plaintiff's access to a diner. *Kreisler, 731 F.3d at 186*. Plaintiff in that case alleged that he passed by the diner three to four times a week and would have attempted to enter were there an indication that the diner was accessible. <u>Id.</u> There was a specific barrier to a specific diner that was encountered at numerous, specified times. Again, this is much more specific than the instant Complaint.

Accordingly, Plaintiff's federal claims are dismissed for a lack of standing.

b. State and City Claims

Plaintiff's New York State and City claims are governed by the same standing requirements as the ADA. *Krelsler v. Humane Soc'y of New York, 2018 U.S. Dist. LEXIS 171147, 2018 WL 4778914, at *6, *8 n.5 (S.D.N.Y. Oct. 3, 2018)* (finding a lack of standing under the ADA and for the same reasons under the New York State Human Rights Law and New York City Human Rights Law); *Panzica v. Mas-Maz, Inc., 2007 U.S. Dist. LEXIS 42171, 2007 WL 1732123, at *2 n.1 (E.D.N.Y. June 11, 2007)* ("Claims for disability discrimination arising under the New York State Human Rights Law or *New York Civil Rights Law § 40-c* are governed by the same legal standards as federal ADA claims.") Plaintiff concedes that federal and state standing requirements are governed by the same legal standards. (Plaintiff's Memorandum Of Law In Response To Defendant's Motion To Dismiss Plaintiff's Complaint, dated Dec. 31, 2018 [dkt. no. 21], at 15); see also **[*10]** *Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 n.3 (2d Cir. 2006)*.

The Court has found that Plaintiff lacks standing under the ADA. Accordingly, the Court finds that Plaintiff lacks standing on her state and city claims. They, too, are dismissed.

CONCLUSION

There is nothing inherently wrong with filing duplicative lawsuits against multiple defendants if the harms to be remedied do exist and are indeed identical. But those who live by the photocopier shall die by the photocopier. By failing specifically to assert any concrete injury, Plaintiff's claims fail as a matter of law.

Defendant's motion to dismiss [dkt. no. 14] is granted, Plaintiff's motion to submit a sur-reply [dkt. no 21] is

denied as moot, and the Clerk of Court is directed to mark this action closed and all pending motions denied as moot.

SO ORDERED.

Dated: New York, New York

March 28, 2019

/s/ Loretta A. Preska

LORETTA A. PRESKA

Senior United States District Judge

---

# *Salameno v. Rawlings*

United States District Court for the Southern District of New York

March 22, 2021, Decided; March 22, 2021, Filed

19 Civ. 4442 (PGG) (BCM)

**Reporter**

2021 U.S. Dist. LEXIS 53454 *; 2021 WL 1085521

THERESA SALAMENO, Individually and on Behalf of the Estate of Lawrence Salameno, Plaintiffs, - against - BRITTANY RAWLINGS, SMARTBOSS, INC., and FASHIONBOSS LLC, Defendants.

**Prior History:** *Salameno v. Rawlings, 2020 U.S. Dist. LEXIS 171552 (S.D.N.Y., Sept. 17, 2020)*

**Counsel:** **[\*1]** For Lawrence Salameno, Theresa Salameno, Plaintiffs: Benjamin Rial Allee, LEAD ATTORNEY, Yankwitt LLP, White Plains, NY; Russell Marc Yankwitt, Yankwitt LLP, White Plains, NY.

For Brittany Rawlings, SmartBoss, Inc., FashionBoss, LLC, Defendants: Jonathan Marc Davidoff, LEAD ATTORNEY, Davidoff Law Firm, PLLC, New York, NY; Glen Alan Kendall, McLoughlin, O'Hara, Wagner & Kendall LLP, Ste 7th Floor, New York, NY.

**Judges:** Paul G. Gardephe, United States District Judge.

**Opinion by:** Paul G. Gardephe

# Opinion

## ORDER

PAUL G. GARDEPHE, U.S.D.J.:

In this action, Plaintiffs Lawrence and Theresa Salameno assert claims for breach of contract, fraud, and an accounting against Defendants Brittany Rawlings, SmartBoss, Inc., and FashionBoss LLC.[1] (Cmplt. (Dkt. No. 1) ¶¶ 55-75) Defendants moved to dismiss (Dkt. No. 44) and for *Rule 11* sanctions (Dkt. No. 53). This Court referred Defendants' motions to

---

[1] Lawrence Salameno died after the pending motion was fully briefed, and his estate has been substituted as a plaintiff. (Dkt. No. 72) For ease of reference, this Order will refer to Mr. Salameno as a plaintiff and to the couple as "Plaintiffs."

Magistrate Judge Barbara Moses for a Report and Recommendation ("R&R"). (Dkt. Nos. 52, 59) Judge Moses has issued a 47-page R&R recommending that this Court dismiss Plaintiffs' fraud claim and claim for an accounting, dismiss in part Plaintiffs' breach of contract claim, and administratively close Defendants' *Rule 11* sanctions motion. (Dkt. No. 76) For **[\*2]** the reasons stated below, Defendants' motion to dismiss will be granted in part and denied in part, and Defendants' motion for sanctions will be denied without prejudice.

## BACKGROUND

## I. FACTS

At all relevant times, Lawrence and Theresa Salameno were married residents of New Jersey and well-known philanthropists. (Cmplt. (Dkt. No. 1) ¶ 12)

In or about 2013, Defendant Brittany Rawlings became acquainted with the Salamenos, and she began "soliciting" financial support from them for her startup business, FashionBoss, which she described as a "fashion business consulting company" that served as "'a comprehensive educational resource and digital tool for creative entrepreneurs' who were fashion designers." (Id. ¶ 19, 22) According to Rawlings, FashionBoss was following a business model that had proven successful for other websites. (Id. ¶ 25) She presented herself as a lawyer and an entrepreneur operating a profitable startup, and told Plaintiffs that "she had devoted her entire life and savings to FashionBoss." (Id. ¶¶ 22, 25) In regular emails to and meetings with the Salamenos, Rawlings described her business plans. (Id. ¶¶ 23-24)

Persuaded by Rawlings' pitch, the Salamenos began sending money **[\*3]** to Rawlings in or about January 2014. (Id. ¶ 26) Rawlings told the Salamenos that she would use their money "for the business of FashionBoss," including to cover expenses for numerous videos that would be displayed on the FashionBoss website. (Id. ¶ 27) By the end of 2014, the

Salamenos had provided Rawlings with $ 170,000. (Id. ¶ 26)

Although the Salamenos repeatedly asked to see examples of the finished videos that had been prepared for the FashionBoss website, Rawlings never provided them. (Id. ¶ 28) In or about 2014, she told the Salamenos that she had launched the FashionBoss website, but that it was in "'beta testing.'" (Id. ¶ 29) As a result, "FashionBoss did not yet have paying clients or any revenue." (Id.) Although Rawlings claimed that the website would generate "substantial revenue . . . once beta testing was complete[,]" the website "remained in 'beta' mode, and FashionBoss generated no revenue." (Id. ¶¶ 29-30)

Plaintiffs further allege that Rawlings never followed through with the FashionBoss business plan that she had described to them, and that she used only a portion of their money for FashionBoss business expenses, spending the rest on "personal and social expenses." **[*4]** (Id. ¶¶ 30-33)

In or about 2016, Rawlings told the Salamenos that she was pursuing a different business plan for a new start-up - "SmartBoss, Inc." (Id. ¶ 34) She described SmartBoss as an artificial intelligence-based "'software and management platform where entrepreneurs and freelancers can benefit from a software that thinks and acts like an executive team.'" (Id.) In emails and in meetings, Rawlings again solicited the Salamenos for money. (Id. ¶ 35) In order to induce the Salamenos to invest in her new venture, Rawlings told them

a. that identified other investors would invest in SmartBoss after a lead investor, i.e. the Salamenos, committed to invest hundreds of thousands of dollars;

b. that she had scheduled meetings with three venture capital funds;

c. that SmartBoss's "current valuation is around $ 10 million";

d. that Rawlings' mother, a Florida attorney, had invested $ 10,000;

e. that SmartBoss had a chief operating officer, lead developer, and numerous other employees, including interns and contractors, and a data scientist consultant;

f. that Rawlings was building an interactive website, and in doing so had "implemented a zero-bug environment, which means we do not build or improve **[*5]** features until all critical, foundational features are completed"; [and]

g. that she and others with whom she was working had made "tremendous progress," with results that work "like magic."

(Id.)

On April 4, 2016, Rawlings told the Salamenos that the SmartBoss website would launch the following month. (Id. ¶ 36) She also claimed that venture capital investors were willing to make a "seed investment" in SmartBoss after a lead investor committed $ 200,000. (Id.) The Salamenos sent Rawlings an additional $ 230,000 on or about April 11, 2016. (Id. ¶ 37) By June 2016, the Salamenos had provided Rawlings with $ 500,000. (Id. ¶ 38)

On or about June 10, 2016, Rawlings and Lawrence Salameno executed an agreement entitled "Smartboss Inc. Terms of Issuance of Series Seed Preferred Stock" (the "SmartBoss Contract"). (Id. ¶ 39) The SmartBoss Contract recounts, inter alia, that Mr. Salameno had previously provided "aggregate proceeds" in the amount of $ 500,000, of which $ 260,000 constituted loans and $ 240,000 constituted investments, "'in connection with the development of the business in FashionBoss, LLC (the "Predecessor").'" (Id. ¶ 40 (quoting SmartBoss Contract (Dkt. No. 51-2) at 1)) The SmartBoss **[*6]** Contract also states that these "[p]revious loans and investments" in FashionBoss are "converted into Series Seed Shares as provided herein," and that SmartBoss stock will be issued to Mr. Salameno. (Id. ¶¶ 40-41 (quoting SmartBoss Contract (Dkt. No. 51-2) at 1)) The SmartBoss Contract further provides that the funds supplied by Mr. Salameno will be used for SmartBoss's "'[w]orking capital needs, including salaries, R&D, rent, sales, [and] legal.'" (Id. ¶ 41 (quoting SmartBoss Contract (Dkt. No. 51-2) at 1)) Finally, the SmartBoss Contract provides that Rawlings is "'responsible for management and day to day operations'" of SmartBoss, and that Mr. Salameno "'will receive standard information and inspection rights' from SmartBoss." (Id. (quoting SmartBoss Contract (Dkt. No. 51-2) at 2))

In or about July and August 2016, Rawlings again solicited the Salamenos for financial support, describing SmartBoss's progress in emails and in a PowerPoint presentation. (Id. ¶ 42) Rawlings told the Salamenos the following:

a. that SmartBoss's "Team" comprised not only Rawlings, but a data scientist and engineer, a chief marketing officer, a data and digital strategist, a chief financial officer, and **[*7]** a chief operating officer;

b. that SmartBoss also had a "Dev Team," comprising six educated and credentialed software engineers;

c. that SmartBoss was creating an "invite only beta site," and that it had more than a thousand users on it, and had been "collecting their credit cards" in order to later charge them $ 45 per month on average to use the site;

d. that Rawlings had numerous other investors interested in investing in SmartBoss, including five venture capital funds with which she was meeting in September, "the other 8 VCs as well, and the 12 early stage VCs";

e. that in 2012 Rawlings had made a $ 100,000 investment;

f. that in 2013 to 2015 Rawlings had obtained an investment she called a "Friends and Family Investment: $ 1.5M $ 300,000 [sic] over 24 months in form of Convertible Note"; and

g. that her monthly expenses for "developer salaries, patents, and rent" were approximately $ 50,000.

(Id.) On September 7, 2016, the Salamenos sent Rawlings another $ 50,000. (Id. ¶ 43)

"In or around late 2016 and early 2017, Rawlings' communications with the Salamenos became significantly less frequent." (Id. ¶ 44) In a January 5, 2017 email to Rawlings, Mrs. Salameno alluded to this decline in [*8] communication: "We hope everything is ok with you as we have not heard from you in months. Larry and I have been reaching out to you since early November because we would like to go over the continuing launch and talk about how SmartBoss is growing." (Id.) On February 10, 2017, the Salamenos sent $ 5,000 to Rawlings, and on August 24, 2017, they sent her $ 6,000. (Id. ¶ 45) In or about August 2017, Rawlings met with the Salamenos and told them "that SmartBoss was going well" and "that the SmartBoss launch would be soon[.]" (Id. ¶ 46)

After the August 2017 meeting, Rawlings did not communicate again with the Salamenos for approximately a year and a half. (Id. ¶¶ 47-49) The Salamenos contacted Rawlings during this period, and asked that she provide information concerning the status of SmartBoss and the money they had provided to her. Rawlings did not respond. (Id. ¶¶ 47-48) In an April 2018 email to Rawlings, Ms. Salameno referred to the lack of communication: "I hope things are well with you and nothing unexpected has happened, either with your health, your family or business, we are very

concerned that we have not been able to speak with you in over 8 months." (Id. ¶ 48)

In a January [*9] 27, 2019 letter to the Salamenos, Rawlings apologized for her lack of communication, explaining "that a problem had arisen with a software developer[,]" Toptal LLC: "'[l]ong story short, the developer had caused the software to be open to the world wide web and a "hacker" walked in and took control of the server.'" (Id. ¶ 49) As a result, "[Toptal] then quit, and the SmartBoss website never launched." Rawlings further claimed that she had hired a lawyer to sue Toptal, and "that a lawsuit would be filed shortly[.]" (Id.)

SmartBoss never issued stock to the Salamenos (id. ¶ 51), and Plaintiffs claim that Rawlings did not "fulfill her responsibility for management and day to day operations of SmartBoss, Inc." Plaintiffs also claim, "[o]n information and belief," that "Rawlings did not use the entirety of the Salamenos' funds for SmartBoss's working capital needs, including salaries, R&D, rent, sales, and legal, but instead used funds of the Salamenos for personal and social expenses." (Id. ¶ 53) Plaintiffs further complain that Rawlings and SmartBoss "did not provide standard information and inspection rights to Lawrence Salameno." (Id. ¶ 54)

## II. PROCEDURAL HISTORY

The Complaint was filed [*10] on May 15, 2019, and alleges breach of contract and fraud. (Id. ¶¶ 55-69) Plaintiffs also seek an accounting. (Id. ¶¶ 70-75)

In a June 20, 2019 letter, Defendants requested a pre-motion conference regarding their contemplated motion to dismiss for lack of subject matter jurisdiction and failure to join a necessary and indispensable party, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(7). (Dkt. No. 10) In a July 9, 2019 order, this Court directed the parties to conduct jurisdictional discovery for thirty days, and to then "submit a joint letter setting forth their views as to what jurisdictional discovery revealed." (Dkt. No. 15)

Disputes arose as to the proper scope of jurisdictional discovery, and on July 29, 2020, this Court referred the case to Magistrate Judge Moses for general pretrial supervision. (Dkt. No. 18) On August 2, 2019, Judge Moses issued an order limiting jurisdictional discovery to (1) whether Plaintiffs are members of FashionBoss; and (2) whether Penny Black Holdings II, LLC ("Penny Black II"), a Salameno-controlled entity, is a necessary party

whose joinder would destroy diversity. (Dkt. No. 31 at 4) After Plaintiffs identified a payment to Rawlings from another Salameno-controlled entity, Penny **[\*11]** Black Holdings, LLC ("Penny Black I") (together with Penny Black II, the "Penny Black Entities"), they notified Judge Moses that Plaintiffs would construe her August 2, 2020 discovery order to include Penny Black I. (Dkt. No. 32) Judge Moses then authorized Defendants to depose a representative of the Penny Black Entities, but denied Defendants' request to further expand jurisdictional discovery. (Dkt. Nos. 34, 40)

On October 2, 2019, Defendants moved to dismiss the Complaint for (1) lack of subject matter jurisdiction, pursuant to _Fed. R. Civ. P. 12(b)(1)_; (2) failure to join an indispensable party, pursuant to _Fed. R. Civ. P. 12(b)(7)_ and _19(a)_; and (3) failure to state a claim, pursuant to _Fed. R. Civ. P. 12(b)(6)_. (Dkt. Nos. 44-46)

Defendants contend that this Court lacks subject matter jurisdiction because (1) there is no diversity of citizenship between the parties; (2) Mrs. Salameno lacks standing to sue for breach of contract; and (3) both Plaintiffs lack standing to bring individual claims against SmartBoss and FashionBoss. (Def. Br. (Dkt. No. 46) at 8-9, 18-24)[2]

Defendants further contend that they are entitled to dismissal under _Fed. R. Civ. P. 12(b)(7)_ and _19(a)_, because the Penny Black Entities are indispensable parties, and their joinder would destroy diversity. (Id. at 24-25)

Finally, Defendants **[\*12]** move to dismiss Plaintiffs' breach of contract, fraud, and accounting claims under _Fed. R. Civ. P. 12(b)(6)_, asserting that (1) the SmartBoss Contract is unenforceable, because it was never executed; (2) even if the SmartBoss Contract were enforceable, Plaintiffs do not allege facts demonstrating that Defendants breached the SmartBoss Contract; (3) the Complaint does not adequately allege fraud; and (4) Plaintiffs' accounting claim fails, because they have not alleged "a confidential or fiduciary relationship between any of the parties or a breach of fiduciary duty." (Id. at 9-11, 26-32)

On October 28, 2019, this Court referred Defendants' motion Judge Moses for an R&R. (Dkt. No. 52)

On November 5, 2019, Plaintiffs moved for sanctions pursuant to _Fed. R. Civ. P. 11_. This Court referred Plaintiffs' sanctions motion to Judge Moses for an R&R. (Dkt. Nos. 53 55, 59). On November 8, 2019, Judge Moses stayed further briefing on Plaintiffs' sanctions motion "[i]n light of the overlap in subject matter between that motion and defendants' fully-briefed motion to dismiss." (Dkt. No. 60)

In her September 17, 2020 R&R, Judge Moses recommends that Defendants' motion to dismiss be granted in part and denied in part:

> Ms. Salameno's individual claim for breach **[\*13]** of contract should be dismissed for lack of standing, because she is not a party to that contract. Mr. Salameno's breach of contract claim (now belonging to the Estate) should be dismissed in part, as to the conduct described in paragraphs 57 and 59 of the Complaint (Dkt. No. 1), because those paragraphs do not plausibly allege a breach of any contractual obligation. Plaintiffs' fraud claim should be dismissed for failure to plead facts showing that defendants' alleged representations were false or misleading. Defendants' accounting claim should be dismissed because plaintiffs do not plead any underlying fiduciary relationship. Leave to replead should be granted as to the breach of contract and fraud claims. Defendants' motion should otherwise be denied.

(R&R (Dkt. No. 76) at 1-2)

## III. OBJECTIONS TO THE R&R

Plaintiffs did not file objections to the R&R. On October 9, 2020, Defendants submitted objections to the R&R in which they contend that

> (1) Plaintiffs should not be granted leave to amend their breach of contract and fraud claims because, inter alia, there is "insurmountable evidence that refutes the breach of contract (and fraud) claims" (Def. Obj. (Dkt. No. 79) at 5-7);
>
> (2) the R&R **[\*14]** "is silent as to the documentary evidence that unequivocally established that the Plaintiffs' claims of fraud and breach of contract are meritless" (id. at 7-9);
>
> (3) the R&R overlooks evidence submitted in SmartBoss's "lawsuit in Delaware against its former website developer . . . [which] establish[es] by clear and indisputable evidence that the Plaintiffs[']

---

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

claims for fraud and breach of contract are wholly meritless" (id. at 9-10);

(4) the R&R "overlooks the documentary evidence that Mr. Salameno anticipator[ily] repudiated the agreement with FashionBoss in 2014" and therefore has "unclean hands" (id. at 10);

(5) the R&R mistakenly concludes that a check from Mrs. Salameno's bank account had been sent to Rawlings, and that absent this check "Mrs. Salameno does not have standing to assert her personal claim for fraud in the inducement" (id. at 10-11);

(6) the R&R errs in concluding that Plaintiffs have standing to bring individual claims against SmartBoss and FashionBoss (id. at 11-12); and

(7) the R&R incorrectly concludes that Ms. Rawlings executed the SmartBoss Contract in her individual capacity. (Id. at 13)

## DISCUSSION

## I. LEGAL STANDARDS

### A. Review of Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation **[*15]** "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *28 U.S.C. § 636(b)(1)(C)*. Where a timely objection has been made to a magistrate judge's recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review.'" *Phillips v. Reed Grp., Ltd.,* 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (quoting *Vega v. Artuz, No. 97Civ.3775LTSJCF, 2002 U.S. Dist. LEXIS 18270, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)*) (alteration in Phillips). "To the extent . . . that the party . . . simply reiterates the original arguments, [courts] will review the Report strictly for clear error." *Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc., No. 07 Civ. 6865(LTS)(GWG), 2008 U.S. Dist. LEXIS 92267, 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)* (citing *Pearson-Fraser v. Bell Atl., No. 01 Civ. 2343(WK), 2003 U.S. Dist. LEXIS 89, 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003)*; *Camardo v. Gen. Motors Hourly-Rate Emps. Pension Plan,* 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see also *Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008)* ("Reviewing courts should review a report and recommendation for clear error where objections are 'merely perfunctory responses,' . . . 'rehashing . . . the same arguments set forth in the original petition.'") (citing *Vega, 2002 U.S. Dist. LEXIS 18270, 2002 WL 31174466, at *1*; *Greene v. WCI Holdings, 956 F. Supp. 509, 513 (S.D.N.Y. 1997)).*

For portions of the R&R to which no timely objection is made, a court's review is limited to a consideration of whether there is any "'clear error on the face of the record'" that **[*16]** precludes acceptance of the recommendations. *Wingate v. Bloomberg, No. 11-CV-188 (JPO), 2011 U.S. Dist. LEXIS 124475, 2011 WL 5106009, at *1 (S.D.N.Y. Oct. 27, 2011)* (quoting *Fed. R. Civ. P. 72(b)* advisory committee note; citing *Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)* ("To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record."))

### B. *Rule 12(b)(1)* Standard

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction). . . ." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007)*. "A case is properly dismissed for lack of subject matter jurisdiction under *Rule 12(b)(1)* when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)*. Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'" *APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003)* (quoting *Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)*)." "In resolving a motion to dismiss for lack of subject matter jurisdiction under *Rule 12(b)(1)*[,] a district court may consider evidence outside the pleadings." *Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008)*, aff'd, *561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010)* (citing *Makarova, 201 F.3d at 113*).

In reviewing a *Rule 12(b)(1)* motion, a court "must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiffs." **[*17]** *J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004)*. The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on conclusory or hearsay statements contained in the affidavits." Id. A court may also "consider 'matters of which judicial notice may be taken.'" *Greenblatt v. Gluck, 03 Civ. 597 (RWS), 2003 U.S. Dist. LEXIS 3846, 2003 WL 1344953, at *1 n.1 (S.D.N.Y. Mar. 19, 2003)* (quoting *Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993))*.

## C. *Rule 12 (b)(6)* Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. "In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the complaint[,]" Kassner v. 2nd *Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007)* (citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002))*, and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing *Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006))*.

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement[,]'" *Iqbal, 556 U.S. at 678* (quoting *Twombly, 550 U.S. at 557*), and does not provide fair allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests[,]" *Port Dock & Stone Corp. v. Oldcastle Ne. Inc., 507 F.3d 117, 121 (2d Cir. 2007)* (citing *Twombly, 550 U.S. at 555*). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish an entitlement to relief]." *Iqbal, 556 U.S. at 678*.

"In considering **[*18]** a motion to dismiss for failure to state a claim pursuant to *Rule 12(b)(6)*, a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)* (citing *Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)*; *Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999))*. "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting *Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006))*.

## D. *Rule 9(b)* Standard

"*Federal Rule of Civil Procedure 9(b)* sets forth a heightened pleading standard for allegations of fraud[.]" *Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006)*. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P. 9(b)*. To satisfy this heightened standard, "'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner, 459 F.3d at 290* (quoting *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993))*. While *Rule 9(b)* provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally[,]" *Fed. R. Civ. P. 9(b)*, a plaintiff "must nonetheless allege facts that give rise to a strong inference of fraudulent intent." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 171 (2d Cir. 2015)* (internal **[*19]** quotation marks and citation omitted). "'The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Lerner, 459 F.3d at 290-91* (quoting *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994))*.

## II. ANALYSIS

### A. Subject Matter Jurisdiction

### 1. Whether Complete Diversity Exists Between the Parties[3]

---

[3] Defendants have not objected to Judge Moses's

Defendants contend that the parties are not completely diverse because Mr. Salameno and FashionBoss are both citizens of New Jersey. (Def. Br. (Dkt. No. 46) at 21) According to Defendants, FashionBoss is a citizen of New Jersey because, as an LLC, its citizenship "is determined by the citizenship of each of its members[,]"and Mr. Salameno - who is a citizen of New Jersey - was a member of FashionBoss on May 15, 2019, when he filed the Complaint. (Id. at 20 (citing *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 49 (2d Cir. 2012)*; *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship, 213 F.3D 48, 51-52 (2d Cir. 2000))*

As Judge Moses notes, "'[t]he question of whose citizenship constitutes part of the LLC's citizenship is ultimately governed by the law of the state of incorporation,'. . . which in this case [i]s the law of Florida." (R&R (Dkt. No. 76) at 22 (quoting *Dumann Realty, LLC v. Faust, No. 09 Civ. 7651(JPO), 2013 U.S. Dist. LEXIS 1127, 2013 WL 30672 at *2 (S.D.N.Y. Jan. 3, 2013)*); id. at 10 (finding that "FashionBoss was an LLC created under the **[*20]** laws of Florida in 2011"))

When Mr. Salameno first invested in FashionBoss in 2013, "Florida law provided that a 'member' of an LLC was a person 'who has been admitted to a limited liability company as a member in accordance with this chapter and has an economic interest in a limited liability company which may, but need not, be represented by a capital account.'" (Id. at 22-23 (quoting *Fla. Stat. § 608.402(21)* (repealed 2015) (emphasis in R&R)) Florida law at that time also provided that "unless the articles of organization or the operating agreement said something different[,] 'no person may be admitted as a member unless a majority-in-interest of the members consent in writing to the admission of the additional member.'" (Id. at 23 (quoting *Fla. Stat. § 608.4232* (repealed 2015) (emphasis in R&R)) Under Florida law, Florida LLCs were required "'to keep at [their] principal office . . . [a] current list of the full names and last known business, residence, or mailing address of all members[.]'" (Id. (quoting *Fla. Stat. § 608.4101(a)* (repealed 2015))

In June 2015, Florida amended its LLC membership requirements to provide that "a person could become a member of a Florida LLC '[w]ith the consent of all [of the LLC's] members,' *Fla. Stat. § 605.0401(3)(c)*, whether or not that consent was in writing." **[*21]** (Id. at 24) LLCs are "still required to 'keep at [their] principal office . . . [a] current list of the full names and last known business, residence of mailing addresses of each member[.]'" (Id. (quoting *Fla. Stat. § 605.0410(a)*) Current Florida law also provides that an LLC member is "a person who has been admitted pursuant to *§ 605.0401* and '[h]as not dissociated from the company under *§ 605.0602*.'" (Id. at 24-25 (quoting *Fla. Stat. § 605.0102(40)*) A person dissociates as a member of an LLC where, "among other things, '[t]here has been a transfer of the person's entire transferable interest in the company,' other than for security purposes or to satisfy a 'charging order' for payment of an unsatisfied judgment." (Id. (quoting *Fla. Stat. § 605.0602(5)(b)*))

Here, Defendants contend that Mr. Salameno was a member of FashionBoss LLC because he invested in the company "with an expectation of receiving a return on his investment," and because the SmartBoss Contract "names Mr. Salameno 'and/or his assignee' as a member of FashionBoss (and a shareholder in SmartBoss)." (Def. Br. (Dkt. No. 46) at 21 (citing SmartBoss Contract (Rawlings Decl. Ex. J. (Dkt. No. 45-10) at 2)) Defendants further argue that, to the extent that the SmartBoss Contract grants inspection rights to Plaintiffs, those rights are "only **[*22]** available to members of a limited liability company." (Def. Br. (Dkt. No. 46) at 22) Finally, Defendants contend that when Rawlings executed a June 10, 2016 "Written Action" "in her capacity as managing member of FashionBoss," she "approved all action taken by FashionBoss prior to June 10, 2016," which "constitutes written acknowledgement that FashionBoss [had] formally admitted Mr. Salameno as well as the Penny Black Entities as members." (Id. at 16, 22) (citing Rawlings Decl., Ex. K (Dkt. No. 45-11))

Judge Moses concludes that Defendants have not demonstrated that Mr. Salameno was a member of FashionBoss at the time the Complaint was filed. Judge Moses first notes that "Defendants have not produced [(1)] any written consent to the admission of Mr. Salameno (or either of the Penny Black Entities) as a member of FashionBoss[,]" or (2) any "list of members containing Mr. Salameno's name (or the name of any Penny Black Entity)," as required under Florida law as of 2013.[4] (R&R (Dkt. No. 76) at 23)

---

recommendations concerning the diversity of citizenship issue. (See Def. Obj. (Dkt. No. 79)) Accordingly, this portion of the R&R is reviewed solely for clear error.

---

[4] Judge Moses also notes "that FashionBoss never issued Mr. Salameno or the Penny Black Entities any Schedule K-1s or other documentation of their interest in the LLC[,]" and that the

Judge Moses goes on to find that she "need not reach th[e] issue" of whether Mr. Salameno became a member of FashionBoss pursuant to the June 2015 amendments to Florida's LLC membership requirements, because **[*23]** "[e]ven if Mr. Salameno was admitted as a member of FashionBoss, he 'dissociated' as such on June 10, 2016, by means of the SmartBoss Contract, which 'converted' his FashionBoss investment into Series Seed Shares in SmartBoss."[5] (Id. at 25) Judge

_____

SmartBoss Contract refers to Mr. Salameno only as a "designee" or as "the Investor," rather than as a "member" of FashionBoss. (Id. at 23-24) And when the SmartBoss Contract converted the $ 500,000 Mr. Salameno had previously provided to FashionBoss into "'Series Seed Shares' in SmartBoss[,]" "Mr. Salameno . . . no longer ha[d] any 'investment' in FashionBoss, [and] his newly-granted 'standard information and inspection rights' could only refer to rights regarding SmartBoss, which was formed under the laws of Delaware." (Id. at 25 (citing SmartBoss Contract (Rawlings Decl. Ex. J. (Dkt. No. 45-10) at 1))

[5] Although Judge Moses does not make a finding as to whether Mr. Salameno became a member of FashionBoss pursuant to the 2015 amendments to Florida's LLC membership requirements, she notes that "the LLC's failure to produce any list of members with Mr. Salameno's name on it, coupled with defendants' failure to issue him a Schedule K-1, mention him in the June 2016 Written Consent that Rawlings - alone - signed, or refer to him as anything other than 'the Investor' in the June 10, 2016 SmartBoss Contract, suggest strongly that Rawlings did not in fact 'consent' to his admission as a member of the LLC," and that therefore Mr. Salameno did not become a member of FashionBoss pursuant to Florida's amended LLC membership requirements. (Id. at 25)

In finding that Mr. Salameno "dissociated" from FashionBoss LLC on June 10, 2016, when he allegedly entered into the SmartBoss Contract, Judge Moses notes that there is a "dispute of fact" as to when Mr. Salameno countersigned the SmartBoss Contract. (Id. at 25-26) If Mr. Salameno did not execute the SmartBoss Contract on June 10, 2016, then he was not definitively dissociated from FashionBoss as of that date. Mr. Salameno "attests that he executed the document on or about June 10, 2016, 'at [his] home in the presence of Ms. Rawlings and others.'" "Rawlings denies this, attesting that Mr. Salameno 'did not countersign' the document and that she did not see a fully executed copy until it was produced in jurisdictional discovery." (Id. at 25-26 (citing Salameno Decl. (Dkt. No. 51) ¶ 7; Rawlings Decl. (Dkt. No. 45) ¶ 37)) Defendants contend that because (1) Rawlings sent an electronic version of the SmartBoss Contract to Mr. Salameno so that he could "'easily sign by electronic signature'"; and (2) an "Adobe 'final audit report' show[s] that [Mr. Salameno] never used the EchoSign technology," Mr. Salameno did not execute the SmartBoss Contract on June 10, 2016. (Id. (citing

Moses therefore concludes that Plaintiffs "have satisfied their burden of showing, by a preponderance of the evidence, . . . that Lawrence Salameno and the Penny Black Entities were not members of FashionBoss on May 15, 2019 [when Plaintiffs filed the Complaint], and therefore that FashionBoss was not a citizen of New Jersey on that date." (Id. at 25-26 (citing _Pearl River Union Free Sch. Dist. v. King, 214 F. Supp. 3d 241, 252 (S.D.N.Y. 2016)_)

This Court finds no clear error in Judge Moses's conclusion that complete diversity exists.

## 2. Whether Mrs. Salameno Has Standing

Defendants contend that Mrs. Salameno does not have standing to assert a breach of contract claim, "because she was never a party to any contract with any of the Defendants and was never an investor, member, or shareholder in FashionBoss [or] SmartBoss." (Def. Br. (Dkt. No. 46) at 24))

"In order to allege the necessary 'personal stake in the outcome of the controversy,' . . . each plaintiff who seeks to invoke the jurisdiction of the federal courts must demonstrate an invasion **[*24]** of her own '"legally-protected interest."'" (R&R (Dkt. No. 76) at 27 (quoting _Warth v. Seldin, 422 U.S. 490, 498-99, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)_; _Kounitz v. Slaatten, 901 F. Supp. 650, 654 (S.D.N.Y. 1995)_ (quoting _Lujan v. Defenders of Wildlife, 504 U.S. 555, 559, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)_))

Here, Judge Moses concludes that Mrs. Salameno was not a party to the SmartBoss Contract, because "[h]er name does not appear on the SmartBoss Contract," and there is no "claim that Ms. Salameno was a third-party beneficiary, an assignee, or otherwise entitled to any substantive rights under that agreement." (Id. at 27) Accordingly, Judge Moses finds that Mrs. Salameno "lacks standing, in her individual capacity, to sue for breach of the SmartBoss Contract." (Id.)

With respect to Plaintiffs' fraud and accounting claims, however, Judge Moses concludes that Plaintiffs have alleged sufficient facts to demonstrate that Mrs. Salameno has a "'personal stake in the outcome of the

_____

Rawlings Reply Decl. Ex. N (Dkt. No. 55-14), Ex. O (Dkt. No. 55-15))) As Judge Moses notes, however, "[t]he fact that Mr. Salameno did not sign the [SmartBoss Contract] electronically . . . says nothing about whether he signed it manually, as he attests." (Id.)

controversy.'" (Id. at 28 (quoting *Warth, 422 U.S. at 498 99)*) Indeed, as Judge Moses notes, the Complaint alleges that Rawlings made "false or misleading statements . . . to both Mr. and Ms. Salameno[,]" and that "Rawlings' statements induced both Mr. and Ms. Salameno to 'give [Rawlings] money.'" (Id. at 28 (citing Cmplt. (Dkt. No. 1) ¶¶ 24, 26-28, 32, 37-38) Plaintiffs have also submitted payment receipts showing that Mrs. Salameno directed funds to FashionBoss from her individual **[\*25]** bank account and to SmartBoss via checks from the Salamenos' joint account. (Id. (citing Salameno Decl. Ex. A (Dkt. No. 51-1) at 5-7, 10, 12)

In objecting to the R&R's recommendation concerning Mrs. Salameno's standing to pursue a fraud claim, Defendants contend that Judge Moses mischaracterized the evidence relating to Mrs. Salameno's payments to FashionBoss. (See Def. Obj. (Dkt. No. 79) at 10-11) This Court reviews Defendants' argument de novo.

Defendants complain that the R&R incorrectly references Mrs. Salameno's June 9, 2014 $ 15,000 investment in FashionBoss twice, and further argue that this June 9, 2014 payment was actually "a payment on behalf of Penny Black in furtherance of Mr. Salameno's obligation." (Id. at 11) Whether or not this payment was improperly referenced twice, however, there is no evidence that the June 9, 2014 payment from Mrs. Salameno's individual bank account was made on behalf of Penny Black and in furtherance of Mr. Salameno's obligation. Indeed, the records concerning this June 9, 2014 payment indicate that the money was drawn from the account of Theresa Salameno and made payable to "FashionBoss." (See Salameno Decl., Ex. A (Dkt. No. 51-1) at 5-7) And even assuming **[\*26]** arguendo that Mrs. Salameno made the June 9, 2014 payment in furtherance of Mr. Salameno's obligation, there are other payments to FashionBoss and SmartBoss that were drawn from the couple's joint bank account. (See Rawlings Decl., Ex. D (Dkt. No. 45-4); Salameno Decl., Ex. A (Dkt. No. 51-1))[6]

Accordingly, this Court will adopt Judge Moses's finding that Mrs. Salameno lacks standing to assert a breach of contract claim, but has standing to assert fraud and accounting claims.

---

[6] In light of these payments, Defendants vague assertion that "no statement from Ms. Rawlings to [Mrs.] Salameno support[s] a claim for fraudulent inducement, as the investment and due diligence was made by Penny Black" (Def. Obj. (Dkt. No. 79) at 10-11)), does not change the outcome.

## 3. Whether Plaintiffs Are Limited to Derivative Claims

Defendants assert that both plaintiffs lack standing to sue FashionBoss or SmartBoss individually, "'rather than derivatively on behalf of the corporation,'" because they seek "damages for a loss of their investment due to the alleged mismanagement and/or diversion of assets by Ms. Rawlings to her own enrichment[.]" (Def. Br. (Dkt. No. 46) at 22-24) (quoting *Moran v. Household Int'l, Inc., 490 A.2d 1059, 1070 (Del. Ch. 1985)*, aff'd, *500 A.2d 246, 249 (Del. 1970)*)

Judge Moses concludes that "[b]ecause SmartBoss is a Delaware corporation, Delaware law governs the question whether plaintiffs have standing to bring direct claims against it (and against Rawlings with respect to that entity) as opposed to derivative claims against Rawlings on the corporation's behalf." (R&R (Dkt. No. 76) at 29 (citing *Newman v. Family Mgmt. Corp., 748 F. Supp. 2d 299, 314 (S.D.N.Y.)*, aff'd, *530 F. App'x 21 (2d Cir. 2013)*) Because FashionBoss is a Florida entity, Judge Moses concludes that "Florida law governs the question of plaintiffs' standing to sue FashionBoss (and Rawlings with respect to that entity) directly." (Id.)

To assert a direct claim against a Delaware corporation, a "'stockholder's claimed direct injury must be independent of any alleged injury to the corporation.'" (Id. (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1039 (Del. 2004)*) In determining whether a stockholder has alleged an independent injury, a court must consider "'solely . . . who suffered the alleged harm . . . and [] who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).'" (Id. (quoting *Tooley, 845 A.2d at 1033*) (emphasis in Tooley)) "Similarly, under Florida law, 'a shareholder of a corporation or a member of an LLC may not maintain an action in his or her own right if the cause of action is derived from the right of the corporation or the LLC to bring the action[,]" but a plaintiff "may bring the suit directly in his own right" "if the injury is 'separate and distinct from that sustained by other stockholders.'" (Id. at 29-30 (quoting *Home Title Co. of Md., Inc. v. LaSalla*, 257 So. 3d 640, 643 (Fla. Dist. Ct. App. 2018); *Alario v. Miller, 354 So. 2d 925, 926 (Fla. Dist. Ct. App. 1978)*)

Noting that "only a member may bring a derivative claim on behalf [of] **[\*28]** an LLC, and only a shareholder may do so on behalf of a corporation[,]" Judge Moses concludes that Plaintiffs claims are direct. (Id. at 30) In

making this determination, Judge Moses notes that "plaintiffs were not members of FashionBoss" and have never "claimed to be shareholders of SmartBoss." (Id.) Moreover, the Complaint alleges a breach claim that is based on contractual obligations owed "personally to [Mr. Salameno]," including the obligation to "'issue stock' to him (which would have made him a shareholder) and [to] provide him with 'information and inspection rights.'" (Id. (quoting Cmplt. (Dkt. No. 1) ¶¶ 60, 61)) Judge Moses further notes that the recovery sought for these breaches — "the return of Mr. Salameno's funds — would benefit only him (not SmartBoss or any other SmartBoss shareholders)." (Id.)

As to Plaintiffs' fraud claim, Judge Moses finds that it "alleges an archetypically direct injury: that [Plaintiffs] were induced to part with their money by means of false and/or misleading representations of fact made directly to them by Rawlings on behalf of herself, FashionBoss, and SmartBoss." (Id. (citing Cmplt. (Dkt. No. 1) ¶¶ 64-67))

Finally, Plaintiffs' accounting claim "seeks [*29] to trace 'the use and ultimate disposition of Plaintiffs' funds,' [Cmplt. (Dkt. No. 1)] ¶ 75, rather than redress a wrong done to either FashionBoss or SmartBoss." (Id. at 31 (citing In re Palm Ave. Partners, LLC, 611 B.R. 457, 470 n.72 (Bankr. M.D. Fla. 2019))

Judge Moses concludes that "plaintiffs' claims, to the extent they are cognizable, were properly brought directly rather than on behalf of either of the two entity defendants." (Id. at 32)

There is no clear error in Judge Moses's finding that Plaintiffs have standing to bring direct claims against Defendants SmartBoss and FashionBoss.[7]

---

[7] Although Defendants object to Judge Moses's finding that Plaintiffs have standing to bring direct claims (Def. Obj. (Dkt. No. 79) at 11-12), their objection merely restates arguments they made before Judge Moses. (Compare id. ("The injury claimed by the Plaintiffs is that Ms. Rawlings 'squandered' the investment funds for personal use[,] . . . [which] is a misappropriation of funds, . . . a claim held by the members of FashionBoss and shareholders of SmartBoss[.]"), with Def. Br. (Dkt. No. 46 at 24 ("Plaintiffs' claims, which seek damages for a loss of their investment due to the alleged mismanagement and/or diversion of assets by Ms. Rawlings . . . fit squarely within the definition of an alleged harm to the corporation as a whole[.]")) Accordingly, Defendants are not entitled to de novo review.

## 4. Whether the Penny Black Entities Are Indispensable Parties

Defendants contend that the Penny Black Entities are indispensable parties whose joinder will destroy diversity. (Def. Br. (Dkt. No. 46) at 24-25) According to Defendants, the Penny Black Entities are indispensable parties, because Plaintiffs seek damages on behalf of the Penny Black Entities. (Id.) If they are not joined as parties, the PennyBlack Entities "would subsequently be able to bring separate and independent claims based upon the same facts and allegations asserted in the present action, seeking essentially the same damages that are being sought here, . . . [which] would . . . subject [Defendants] to [*30] multiple obligations on the same claim." (Id. at 25)

As Judge Moses states, "[m]otions to dismiss an action for failure to join an indispensable party are disfavored." (R&R (Dkt. No. 76) at 32 (citing Universal Reinsurance Co.v. St. Paul Fire & Marine Ins. Co., 312 F.3d 82, 87 (2d Cir. 2002)) The moving party must establish that (1) "'the absent party is a "party to be joined if feasible" (i.e., a "necessary party") under Rule 19(a),'" and (2) "the absent party cannot be joined (typically for jurisdictional reasons) but is so 'indispensable' that the action should, 'in equity and good conscience' be dismissed." (Id. (quoting Make Up For Ever, S.A. v. SOHO Forever, LLC, 198 F.R.D. 56, 59-60 (S.D.N.Y. 2000) (quoting Fed. R. Civ. P. 19(a))) Under Rule 19(a), a party is "necessary" if "(A) 'in that person's absence the court cannot accord complete relief among existing parties'; or (B) 'that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligation because of the interest.'" (Id. at 33 (quoting Fed. R. Civ. P. 19(a)(1)) "'"Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's [*31] order concerning the same incident."'" (Id. (quoting Fed. Ins. Co. v. SafeNet, Inc., 758 F. Supp. 2d 251, 258 (S.D.N.Y. 2010) (alteration omitted) (quoting Gibbs Wire & Steel Co. v. Johnson, 255 F.R.D. 326, 330 (D. Conn. 2009))

Judge Moses concludes that Defendants "have not identified any 'inconsistent obligations' to which they could be subject as a result of the non-joinder" of the Penny Black Entities, and then goes on to consider whether Defendants face a "risk of double recovery."

(Id. at 33-34) Judge Moses finds that the Penny Black Entities could not "sue defendants for breach of contract because, like Ms. Salameno, they are not parties to the SmartBoss Contract[,]" and that any suit for fraud would be based on the "misrepresentations made to and relied upon by the Salamenos[.]" Accordingly, the Penny Black Entities would be "bar[red] . . . from suing defendants a second time." (Id. at 34 (citing *Donovan v. Lewnowski, No. 03-CV-2985(DLI)(JO), 2005 U.S. Dist. LEXIS 34268, 2005 WL 2095739, at \*6-7 (E.D.N.Y. Aug. 30, 2005)*; *Harding v. Paramount Pictures, No. 12 Civ. 66(DAB)(HBP), 2013 U.S. Dist. LEXIS 54217, 2013 WL 174401, at \*7-8 (S.D.N.Y. Jan 16, 2013)*, report and recommendation adopted, *No. 12 Civ. 66(DAB), 2013 U.S. Dist. LEXIS 44954, 2013 WL 1285423 (S.D.N.Y. Mar. 28, 2013))* Judge Moses concludes that the risk of double recovery is "close to nonexistent, and certainly nowhere near 'substantial.'" (Id.) (citing *Fed. R. Civ. P. 19(a)(1)(B)(ii)*)

Having found that the Penny Black Entities are not necessary parties, Judge Moses notes that even if the Penny Black Entities were indispensable parties, their joinder would not destroy diversity because, like Mr. Salameno, the Penny **[\*32]** Black Entities were not members of FashionBoss when the Complaint was filed. (Id. at 35)

This Court finds no clear error in Judge Moses's finding that the Penny Black entities are not indispensable parties.

## B. Whether the Complaint Fails to State a Claim under *Rule 12(b)(6)*

As discussed above, in moving to dismiss Plaintiffs' breach of contract, fraud, and accounting claims under *Fed. R. Civ. P. 12(b)(6)*, Defendants contend that (1) the SmartBoss Contract is unenforceable, because it was never executed; (2) even if the SmartBoss Contract were enforceable, Plaintiffs do not allege facts demonstrating that Defendants breached the SmartBoss Contract; (3) the Complaint does not adequately allege fraud; and (4) Plaintiffs' accounting claim fails, because they have not alleged "a confidential or fiduciary relationship between any of the parties or a breach of fiduciary duty." (Def. Br. (Dkt. No. 46) at 26-32)

Judge Moses recommends that Mrs. Salameno's breach of contract claim be dismissed for lack of standing, because she is not a party to the SmartBoss Contract. (R&R (Dkt. No. 76) at 1-2, 27) Judge Moses further

recommends that Mr. Salameno's breach of contract claim be dismissed to the extent that it is based on allegations that Defendants **[\*33]** failed to (1) launch and operate SmartBoss; and (2) communicate with Plaintiffs after August 2017. (Id. at 2, 39-40) According to Judge Moses, these allegations are not sufficient to plausibly allege a breach of the SmartBoss Contract. (Id.)

Judge Moses further recommends that Plaintiffs' fraud claim be dismissed because Plaintiffs have not adequately pled that Defendants' alleged misrepresentations were false or misleading. (Id. at 2, 41-44) Finally, Judge Moses recommends that Plaintiffs' claim for an accounting be dismissed, because Plaintiffs have not pled facts demonstrating that a fiduciary relationship existed between Plaintiffs and Defendants. (Id. at 2, 45-46)

As to leave to amend, Judge Moses recommends that Plaintiffs be granted leave as to their breach of contract and fraud claims, but denied leave to amend as to their accounting claim. (*Id. at 40, 44, 46*)

In their objections, Defendants contend, inter alia, that Judge Moses should have recommended that (1) Mr. Salameno's breach of contract claim be dismissed in its entirety; and (2) leave to amend be denied as to Plaintiffs' breach of contract and fraud claims. (Def. Obj. (Dkt. No. 79) at 5-12)

## 1. Whether Judge Moses Should Have Considered Documents Outside the Complaint

**[\*34]** In arguing that Plaintiffs' breach and fraud claims should be dismissed without leave to amend, Defendants contend that Judge Moses improperly failed to consider documentary evidence that they submitted which "absolutely refute[s]" those claims. (See Def. Obj. (Dkt. No. 79) at 1-9) The Court reviews this objection de novo.

As discussed above, in resolving a *Rule 12(b)(6)* motion, a court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco, 622 F.3d at 111*. "Where a document is not incorporated by reference, the court may [nevertheless] consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting *Mangiafico, 471 F.3d at 398*)

"[B]efore materials outside the record may become the basis for a dismissal, several conditions must be met. For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)* (internal citations omitted) "This principle is driven by a concern that a plaintiff may lack notice [*35] that the material will be considered to resolve factual matters." *Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016)* (citing *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 28 (2d Cir. 1991))*

Here, Defendants contend that documents disproving Plaintiffs' breach of contract and fraud claims were "cited throughout the memorandum of law in support of the motion to dismiss and other letters and presentations to the Court," but were improperly "overlooked and not considered in" the R&R. (Def. Obj. (Dkt. No. 79) at 8) In support of their objections, Defendants submit more than 350 pages of documents, including invoices, payment records, bank statements, receipts, and travel records (see Dkt. Nos. 79-4, 79-5, 79-6, 79-7), as well as the complaint and answer in SmartBoss Inc. v. Toptal LLC, No. N19C-06-130 (SKR) (Del. Super. Ct.) — SmartBoss's lawsuit against Toptal, its former website developer. (See Dkt. Nos. 79-9, 79-10)

According to Defendants, these documents show that: (1) Plaintiffs' "investment funds were used to invest in SmartBoss and FashionBoss"; (2) "in SmartBoss's lawsuit against . . . Toptal, LLC[, Toptal] admitted that it was paid $228,428.74 between the months of June 2016 and August 2017, which represents just less than $2,000 of the Plaintiff's 2016 investment"; (3) "[l]oan holders and [*36] other investors contributed to FashionBoss and SmartBoss, and existed before and after the Salameno[s]"; (4) "[t]he money investment in 2016 was not induced by any misrepresentation, and was a pre-existing duty from the original Penny Black investment (thus no additional inducement was needed as the obligation existed)"; and (5) "Rawlings used her personal funds (unrelated to the entities) for the purported travel to Miami on a Saturday in February 2016[, and] at such time, Salameno/Penny Black had breached the investment agreement in 2014 and was before the April 2016 money [sic]." (Id. at 8-9) (emphasis in original)

To the extent that Defendants assert that Judge Moses should have considered these documents, their objection is overruled. Defendants do not explain how any of these documents are "integral" to the Complaint, nor have they demonstrated that it is "clear on the record that no dispute exists regarding the authenticity or accuracy of the document[s]" and that there are no "material disputed issue of fact" as to their relevance. *Faulkner, 463 F.3d at 134*. To the contrary, Plaintiffs dispute the authenticity, accuracy, and relevance of these documents. (See Pltfs. Opp. (Dkt. No. 83) at 10 (arguing that Defendants [*37] have submitted "a series of handpicked, unauthenticated items . . . [which are] not clear, self-explanatory, or demonstrative of any defense to several of [Rawlings'] breaches of contract, and do not come close to giving a full accounting of the funds Defendants received nor what they did with those funds"))

The Court concludes that Judge Moses properly refused to consider the documents submitted by Defendants in resolving their *Rule 12(b)(6)* motion.

## 2. Whether the Breach of Contract Claim Should Be Dismissed in its Entirety

Judge Moses recommends that Defendants' motion to dismiss be granted as to Mrs. Salameno's breach of contract claim and as to Plaintiffs' claims that Defendants breached the SmartBoss Contract by failing to (1) launch and operate SmartBoss; and (2) communicate with Plaintiffs after August 2017. (R&R (Dkt. No. 76) at 1-2, 39-40) This Court sees no clear error in Judge Moses's recommendations concerning these points.

In their motion to dismiss, however, Defendants contend that Plaintiffs' breach of contract claim should be dismissed in its entirety, because Mr. Salameno did not execute the SmartBoss Contract in 2016, and the alleged contract is thus "not enforceable." (Def. Br. (Dkt. [*38] No. 46)) at 31) Defendants further contend that, even if the SmartBoss Contract were enforceable, "the Complaint sets forth no specific facts demonstrating that" Defendants breached the SmartBoss Contract. (Id.)

A breach of contract claim must allege "the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (citing *First Inv'rs Corp. v. Liberty Mut. Ins. Co., 152*

THIS

*F.3d 162, 168 (2d Cir. 1998))* To adequately allege breach of contract, a complaint must set forth facts demonstrating "that an enforceable contract existed"; a plaintiff may not rely on "[c]onclusory allegations that a defendant breached an agreement." *Roberts v. Karimi, 251 F.3d 404, 407 (2d Cir. 2001); Frontline Processing Corp. v. Merrick Bank Corp., No. 13 Civ. 3956, 2014 U.S. Dist. LEXIS 27571, 2014 WL 837050, at *2-3 (S.D.N.Y. Mar. 3, 2014)*.

As to Defendants' argument that the SmartBoss Contract is not enforceable because it "was 'neither executed by Mr. Salameno nor delivered to any of the Defendants until after this action was commenced[,]" Judge Moses finds that — although "the parties have submitted conflicting declarations on this point" — the Complaint "clearly alleges that both 'Rawlings and Lawrence Salameno' signed [the SmartBoss Contract], [Cmplt. (Dkt. No. 1)] ¶ 39, and both copies submitted to the Court are fully executed," which is sufficient at the *Rule 12(b)(6)* stage. (R&R (Dkt. No. 76) at 38 (citing Salameno Decl., Ex. B (Dkt. **[*39]** No. 51-2); Rawlings Decl., Ex. J (Dkt. No. 45-11)) This Court agrees with Judge Moses' analysis.

In their motion to dismiss, and in their objections, Defendants argue that the breach claim against Rawlings should be dismissed because she is not a party to the SmartBoss Contract, having "signed [the contract] only on behalf of SmartBoss."[8] (Def. Br. (Dkt. No. 46) at 31; Def. Obj. (Dkt. No. 79) at 13)

As an initial matter, this Court agrees with Judge Moses's finding that the SmartBoss Contract may be

considered in resolving Defendants' *Rule 12(b)(6)* motion, because it is incorporated by reference in the Complaint. (See, e.g., Cmplt. (Dkt. No. 1) ¶¶ 39-41; see also *DiFolco, 622 F.3d at 111*)

The SmartBoss Contract shows that Rawlings "signed the contract on a signature line below which was typed simply, 'Brittany Rawlings.'" (R&R (Dkt. No. 76) at 38 (citing SmartBoss Contract (Dkt. No. 51-2) at 3)) Moreover, the SmartBoss Contract sets forth rights and obligations that are "personal to Rawlings[,]" including that Rawlings would "'serve as the President and Chief Executive Officer of the Company and will be responsible for management and day to day operations, reporting [to] the Company's Board of Directors.'" ( **[*40]** Id. (quoting SmartBoss Contract (Dkt. No. 51-2) at 3) (alteration in R&R)) In sum, this Court sees no error in Judge Moses's finding that Plaintiffs have adequately alleged that Rawlings signed the SmartBoss Contract in her personal capacity.[9]

As to Defendants' argument that the Complaint does not plead a breach of contract claim (Def. Br. (Dkt. No. 46) at 30-32), Judge Moses finds that Plaintiffs adequately allege that Defendants breached the SmartBoss Contract by failing to (1) issue stock to the Salamenos; (2) use Plaintiffs' funds for SmartBoss business purposes; and (3) "provide 'standard information and inspection rights' to Mr. Salameno." (R&R (Dkt. No. 76) at 38-39 (citing Cmplt. (Dkt. No. 1) ¶¶ 51, 58, 60-61)) In making these findings, Judge Moses notes that Plaintiffs' allegations of breach are supported by citations to contractual provisions that create these obligations. (*Id. at 38-39*) (noting that "[t]he SmartBoss Contract contemplated the issuance of 'Series Seed

---

[8] Because Defendants repeat the arguments they made before Judge Moses, this Court reviews the magistrate judge's recommendation only for clear error. Compare (Def. Obj. (Dkt. No. 79) at 13) ("The parties referenced are 'SmartBoss Inc.' and 'Lawrence Salameno' (as investor), and 'Brittany Rawlings (founder [of FashionBoss LLC (predecessor) and SmartBoss Inc.)]'. It must be inferred that as the 'Founder' of SmartBoss and FashionBoss, Ms. Rawlings executed the agreement only in this representative capacity, as there is no evidence that she did so in her individual capacity.") (citation omitted) (alteration and emphasis in Def. Obj. (Dkt. No. 79)), with (Def. Br. (Dkt. No. 46) at 31) ("At the outset, Ms. Rawlings personally is not a named party to the [SmartBoss Contract] and is not bound under the agreement, as she signed such only on behalf of SmartBoss. Only Mr. Salameno and SmartBoss are named as parties and there is no language in the [SmartBoss Contract] to demonstrate that its terms were enforceable against Ms. Rawlings in her individual capacity.") (citation omitted).

[9] In their objections, Defendants cite to a June 10, 2016 "written action" by SmartBoss in which SmartBoss purportedly "assumed all responsibility and liability of any pre-incorporator or founder or other corporate acts per the written action." According to Defendants, this "written action" demonstrates that Rawlings "had no independent obligations to the Plaintiffs" under the SmartBoss Contract. (Def. Obj. (Dkt. No. 79) at 13 (citing Dkt. No. 45-11)) However, Defendants did not make this argument in their motion to dismiss. (See Def. Br. (Dkt. No. 46) at 31-32) "'In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.'" *United States v. Gladden, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019)* (quoting ***Hubbard v. Kelley, 752 F. Supp. 2d 311, 313 (W.D.N.Y. 2009))***. Accordingly, this argument will not be considered.

Shares' to Mr. Salameno or his designee equivalent to 24% of the corporation's stock[,]" that it "stated that plaintiff's funds would be used for the company's '[w]orking capital needs, including salaries, R&D, rent, sales, **[*41]** [and] legal,'" and that Rawlings "failed to respond to a written request that she 'provide, among other things, information about the status of SmartBoss and the loans and investments [Plaintiffs] had provided,'" even though the SmartBoss Contract grants Mr. Salameno "'standard information and inspection rights.'" (*Id. at 39* (quoting SmartBoss Contract (Dkt. No. 51-2) at 1); Cmplt. (Dkt. No. 1) ¶¶ 44, 47-48, 51, 53) This Court finds no error in Judge Moses's analysis of Plaintiffs' breach of contract claim.

In their objections to the R&R, Defendants further argue that Plaintiffs' breach of contract claim should be dismissed because Mr. Salameno has "unclean hands." (Def. Obj. (Dkt. No. 79) at 10) Because Defendants could have, but did not, make this argument in their briefing on the motion to dismiss, this Court will not consider it now.[10] See *Gladden, 394 F. Supp. 3d at 480*.

In sum, this Court finds no error in Judge Moses's analysis of Plaintiffs' breach of contract claim, and adopts Judge Moses's recommendation that Defendants' *Rule 12(b)(6)* motion be granted "with respect to the breaches alleged in Complaint paragraphs 57 and 59, and otherwise denied." (R&R (Dkt. No. 76) at 40)

### 3. Dismissal of Fraud Claim

---

[10] Even if Defendants' unclean hands argument were properly before this Court, it would fail. The doctrine of unclean hands cannot serve as a basis for dismissing Plaintiffs' breach of contract claim, because it is "'an equitable defense to equitable claims' and does not apply to claims that 'seek damages in an action at law.'" *Puebla Palomo v. DeMaio, 403 F. Supp. 3d 42, 61 (N.D.N.Y. 2019)* (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 607 (2d Cir. 2005))*. Moreover, unclean hands is "'an affirmative defense'" and, as such, "'may [only] be raised by a pre-answer motion to dismiss under *Rule 12(b)(6)*, without resort to summary judgment procedure, if the defense appears on the face of the complaint.'" *McDonald v. Elkholy, 16 CV 2201 (AMD)(LB), 2017 U.S. Dist. LEXIS 119030, 2017 WL 3503385, at *4 (E.D.N.Y. July 27, 2017)* (quoting *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998))*. Here, Plaintiffs seek damages, not equitable relief, and the facts supporting Defendants' unclean hand defense do not appear on the face of the Complaint. (See Cmplt. (Dkt. No. 1))

In support **[*42]** of Plaintiffs' fraud claim, the Complaint alleges that Defendants

> made "false and fraudulent representations to the Salamenos," either knowingly or recklessly, concerning (a) how plaintiffs' money would be used; (b) "the existence of other interested investors, and the value of SmartBoss"; (c) whether others had made investments in both of Rawlings's businesses; (d) the existence of "numerous" employees, contractors, and other personnel working for the businesses; and (e) the "operation[s]" of FashionBoss and SmartBoss.

(R&R (Dkt. No. 79) at 41 (quoting Cmplt. (Dkt. No. 1) ¶ 65) (alteration in R&R))

In their motion to dismiss, Defendants argue that the Complaint "utterly fails to allege any false or fraudulent statements made by Defendants," and does not "provide Defendants with sufficient notice of the nature of their alleged fraud." (Def. Br. (Dkt. No. 46) at 21)) Defendants further argue that Plaintiffs have not adequately pled scienter and that their fraud claim is time-barred. (*Id. at 23*)

To bring a fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance **[*43]** on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006))*[11] Because *Rule 9(b)* imposes a heightened pleading standard on fraud claims, the plaintiff must "'specify'" the fraudulent statements, "'identify the speaker . . . state where and when the statements were made, and . . . explain why the statements were fraudulent.'" *United States ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc., 856 F.3d 71, 81 (2d Cir. 2017)* (quoting *United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 25 (2d Cir. 2016))*

Applying these standards to the Complaint, Judge Moses finds that "while plaintiffs have adequately specified the allegedly fraudulent statements, identified the speaker (Rawlings), and (in most instances) stated where and when the statements were made, . . . they have consistently failed to allege facts that explain why (or indeed whether) the statements were false or fraudulent when made." (R&R (Dkt. No. 76) at 41 (citing

---

[11] Noting that the parties "apply New York law to the fraud claim" and that there is no conflict between New York law and New Jersey law on this point, Judge Moses applies New York law. (R&R (Dkt. No. 76) at 41)

Cmplt. ¶¶ 27, 29, 32, 35(a)-(g), 36, 42(a)-(g), 46, 49, 64-66)) For example, Judge Moses finds that Plaintiffs failed to allege that Rawlings' statement that she would use the Salamenos' funds "'for the business of FashionBoss to, among other things, produce' educational videos," was false when made, or in other words "'that "there existed an intent not to perform at the time the promise was made."'" (*Id. at 42* (quoting *Soley v. Wasserman, 823 F. Supp. 2d 221, 235 (S.D.N.Y. 2011)* (quoting *Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994)* (emphasis **[*44]** in *Soley*)) Judge Moses reasons that Plaintiffs' factual support for this allegation — that Rawlings "'never provided samples of completed videos' and, 'on information and belief,' used some of the Salamenos' funds 'for her own personal and social expenses'" — does not amount to a claim that Rawlings knew the aforementioned representations were false at the time she made them. (Id. (quoting Cmplt. (Dkt. No. 1) ¶¶ 27-28, 31)

Although Plaintiffs argue that they sufficiently pled scienter by alleging that Rawlings "knowingly made false and fraudulent misrepresentations," this argument — as Judge Moses concludes — does not address the requirement to allege a "present intention not to perform when [the defendant] made [the] alleged promises." (Id. (citing Pltf. Opp. (Dkt. No. 49) at 28-29; *Solely, 823 F. Supp. 2d at 235*))

Judge Moses also finds that Plaintiffs failed to "plead 'with particularity' that Rawlings misused the funds they provided for personal expenses," because their only concrete allegation in support of this claim is that "Rawlings was photographed attending a party in Miami three days after she emailed Ms. Salameno to say that she was 'back in NY' and would be meeting with potential investors." (Id. (citing **[*45]** Cmplt. (Dkt. No. 1) ¶¶ 32-33)) Judge Moses reasons that these allegations only "invite the Court to conclude, from this, not only that Rawlings was untruthful in her email (which does not necessarily follow), but also that she was using their money, rather than personal funds to party in Miami[,]" and that "*Rule 9(b)* does not permit the Court to take that leap." (Id.)

Judge Moses concludes that Plaintiffs' "remaining fraud allegations suffer from similar deficiencies." (Id.) For example, although Plaintiffs "claim that Rawlings misrepresented 'the existence of other interested investors, and the value of SmartBoss, Inc.,'" the Complaint does not allege "that there were no other interested 'VC investors,' or that the 'current valuation' of SmartBoss in the spring of 2016 was not 'around $10

million." (Id. At 42-43 (citing Cmplt. (Dkt. No. 1) ¶¶ 65(b), 35(c), 36)) And although Plaintiffs "claim that Rawlings lied about the 'existence of other investments' in FashionBoss and SmartBoss," the Complaint does not "assert that Rawlings' mother did not invest $10,000 or 'commit' another $10,000, . . . or that Rawlings herself did not make a $100,000 investment in 2012." (*Id. at 43* (citing Cmplt. (Dkt. No. 1) **[*46]** ¶¶ 35(d), 36 42(e), 65(c)) (emphasis in R&R)

Judge Moses further finds that the Complaint does not plead facts in support of Plaintiffs' assertion that Rawlings' statements about "'the existence of numerous salaried employees, contractors, interns, and consultants' of FashionBoss and SmartBoss" were misleading or false. (*Id. at 43* (quoting Cmplt. (Dkt. No. 1) ¶ 65(d)) Similarly, Plaintiff's allegations regarding "Rawlings' statements about the 'operation[s]' of FashionBoss and SmartBoss" are inadequate, because Plaintiffs do not "allege that those statements were false," and have not offered "supporting facts to demonstrate that Rawlings and her team did not 'complete[] a great deal of work' in March 2016 . . .; that SmartBoss was not creating an 'invite only beta site' in July and August of that year; that the site did not have 'more than a thousand users on it'; and/or that SmartBoss was not 'collecting their credit cards.'" (Id. (quoting Cmplt. (Dkt. No. 1) ¶¶ 36, 42(c))

Based on these findings, Judge Moses recommends that Plaintiffs' fraud claim be dismissed.[12] (*Id. at 44*)

---

[12] "In light of the pleading deficiencies" she identifies, Judge Moses does not reach Defendants' argument that Plaintiffs' fraud claim is barred by New York's six-year statute of limitations for fraud. (R&R (Dkt. No. 76) at 44 n.23 (citing *N.Y.C.P.L.R. § 213(8)*)). She notes, however, that while Defendants argue that Plaintiffs' fraud claim is time-barred to the extent it is based on allegations that Plaintiffs were fraudulently induced to "'enter into an investment agreement on April 1, 2013, and to concurrently provide FashionBoss with a $50,000 disbursement in accordance therewith,'" the Complaint does "not allege that [Plaintiffs] entered into an investment agreement on April 1, 2013, nor that they made a $50,000 disbursement 'in accordance therewith.'" (R&R (Dkt. No. 76) at 44 n.23 (quoting (Def. Br. (Dkt. No. 46) at 30)) Judge Moses further notes that a statute of limitations defense "may be raised on a motion to dismiss only if it 'appears on the face of the complaint,' Bruno v. Casella Waste Sys., Inc., 616 F[ed.] App'x 20, 20 n.1 (2d Cir. 2015) (quoting *Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014))*, is apparent from documents attached to or integral to the complaint, or arises from 'matters of which judicial notice may [properly] be taken,' *Landow v. Wachovia Sec., LLC, 966*

This Court finds no error in Judge Moses's analysis of Plaintiffs' fraud claim. Accordingly, Defendants' motion to dismiss Plaintiffs' **[\*47]** fraud claim will be granted.

### 4. <u>Accounting</u>

In the Complaint, Plaintiffs seek an accounting of the funds that Rawlings "accepted . . . from the Salamenos as loans and investments in FashionBoss, LLC and SmartBoss, Inc.," including "the use and ultimate disposition of Plaintiffs' funds." (Cmplt. (Dkt. No. 1) ¶¶ 71, 75)) Defendants argue that Plaintiffs' claim for an accounting should be dismissed, because "Plaintiffs do not allege a confidential or fiduciary relationship between any of the parties or a breach of fiduciary duty." (Def. Br. (Dkt. No. 46) at 32)

As Judge Moses notes, "'[t]o obtain an accounting under New York law, a plaintiff must show: "(1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no legal adequate remedy; and (4) in some cases, a demand for an accounting and a refusal."'" (R&R (Dkt. No. 76) at 45 (quoting _Ellington Credit Fund, Ltd. v. Select Portfolio Servicing Inc., 837 F. Supp. 2d 162, 207 (S.D.N.Y. 2011)_ (quoting IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F. Supp. 3d 395, 411 (S.D.N.Y. 2009)) Moreover, "'"[t]he right to an accounting is premised on a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking an accounting **[\*48]** has an interest."'" (Id. (quoting _Ctr. For Rehabilitation & Nursing at Birchwood, LLC v. S & L Birchwood, LLC, 92 A.D.3d 711, 713, 939 N.Y.S.2d 78 (2d Dept. 2012)_ (quoting _Palazzo v. Palazzo, 121 A.D.2d 261, 265, 503 N.Y.S.2d 381 (2d Dept. 1986))_

---

_F. Supp. 2d 106, 127-28 (E.D.N.Y. 2013)_," and that "it is a close question whether the April 1, 2013 check is 'integral to the complaint.'" (Id.) Judge Moses advises Plaintiffs that, "[s]hould [they] replead [their fraud] claim, they would be well advised to acknowledge the date of their initial payment and set forth the facts, if any, showing that they did not wait too long to sue for its recovery." (Id.) This Court sees no error in Judge Moses's analysis and approach.

In their objections, Defendants contend that Plaintiffs' breach of contract claim is "time-barred." (Def. Obj. (Dkt. No. 79) at 6 n.5)) Because this argument was not raised in Defendant's motion to dismiss, Defendant's objection will be overruled. See _Gladden, 394 F. Supp. 3d at 480_.

Judge Moses finds that Plaintiffs have not adequately pled a claim for an accounting, because they have not alleged a confidential or fiduciary relationship with any defendant. (Id.) Indeed, "Plaintiffs deny that they were members of FashionBoss or shareholders of SmartBoss," and do not "allege any comparable relationship." (Id.) Judge Moses further finds that an accounting claim is inappropriate here, because "a portion of Mr. Salameno's contract claim is viable (and plaintiffs may succeed in repleading their fraud claim as well)," and Plaintiffs will therefore "have 'the tools of discovery' . . . to determine 'the use and ultimate disposition of [their] funds.'" (_Id. at 45-46_ (quoting IMG Fragrance Brands, 679 F. Supp. 2d at 411 (alteration in R&R)); Cmplt. (Dkt. No. 1) ¶ 75) For these reasons, Judge Moses recommends that Plaintiffs' claim for an accounting be dismissed.

The Court finds no error in Judge Moses's analysis of Plaintiffs' claim for an accounting. Accordingly, Defendants' motion to dismiss will be granted as to Plaintiffs' claim for an accounting.

### C. <u>Leave to Amend</u>

Judge Moses recommends that Plaintiffs be granted leave to amend their breach of contract and fraud claims, noting that **[\*49]** "there have been no prior amendments of the pleadings, and . . . at least some of the deficiencies described above could be remedied by amendment." (R&R (Dkt. No. 76) at 40, 44, 47) Defendants object to this portion of the R&R, arguing that any amendment would be futile, "frivolous," and "made in bad faith." (See Def. Obj. (Dkt. No. 79) at 6-7; Def. Reply (Dkt. No. 86) at 3-6)

"[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." _Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003)_ (citing _Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991))_. "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." _Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002)_ (citing _Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)_; _Koehler v. Bank of Berm. (N.Y.) Ltd., 209 F.3d 130, 138 (2d Cir. 2000))_.

Here, granting Plaintiffs leave to amend their breach of contract and fraud claims is appropriate. There has

been no prior amendment to the Complaint, and this Court cannot find that the pleading defects discussed above are not subject to cure. Accordingly, leave to amend is granted as to Plaintiffs' breach of contract and fraud claims.

As to Plaintiffs' claim for an accounting, Plaintiffs have asserted that **[*50]** they were not members of FashionBoss or SmartBoss. Accordingly, it is not clear whether Plaintiffs will be able to plead facts demonstrating that they had a confidential or fiduciary relationship with Defendants. "[T]o allege a fiduciary relationship, four elements are required: '(1) [t]he vulnerability of one party to the other which (2) results in the empowerment of the stronger party by the weaker which (3) empowerment has been solicited or accepted by the stronger party and (4) prevents the weaker party from effectively protecting itself.'" *Gate Techs., 2013 U.S. Dist. LEXIS 95368, 2013 WL 3455484, at *7* (quoting *Atlantis Info. Tech., GmbH v. CA, Inc., 485 F. Supp. 2d 224, 231 (E.D.N.Y. 2007)* (quotations and citations omitted)). While Plaintiffs must show more than a "conventional business relationship" in order to allege a fiduciary relationship (see id. (quoting *Osan Ltd. v. Accenture LLP, 454 F. Supp. 2d 46, 57 (E.D.N.Y. 2006))*, this Court cannot find on the present record that it is impossible for Plaintiffs to do so.

Some courts in this Circuit have dismissed an accounting claim where it is accompanied by a breach of contract (or tort claim) premised on the same facts, on the theory that the plaintiff will "be able to obtain the information and damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law.'" **[*51]** *Najjar Grp., LLC v. West 56th Hotel LLC, No. 14-cv-7120, 2017 U.S. Dist. LEXIS 29200, 2017 WL 819487, at *3 (S.D.N.Y. Mar. 1, 2017)* (quoting *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC, 159 F. Supp. 3d 324, 340 (E.D.N.Y. 2016))*; see also, e.g., *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 49 (2d Cir. 1996)* ("Because the plaintiffs have sought money damages in both their breach of contract and conversion claims, and because discovery as to the measure of damages would be available to them if they were to prevail on those claims, they can obtain all the information they seek in their existing claims at law. . . . Accordingly, no useful purpose would be served by treating the plaintiffs' equitable accounting claim as an additional, and duplicative, action at law."); *Ellington, 837 F. Supp. 2d at 207* ("[A]n equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter.") (citing *Physicians Mut. Ins.*

*Co. v. Greystone Servicing Corp., No. 07 CIV. 10490 (NRB), 2009 U.S. Dist. LEXIS 32616, 2009 WL 855648, at *11 (S.D.N.Y. Mar. 25, 2009))*.

Other courts have allowed breach of contract and accounting claims to proceed when pleaded in the alternative, or to the extent that the accounting claim is based on conduct constituting the "'breach of a duty arising out of the relationship created by the contract but independent of the contract itself.'" *LaRoss Partners, LLC v. Contact 911 Inc., 874 F. Supp. 2d 147, 167 (E.D.N.Y. 2012)* (quoting *La Barte v. Seneca Res. Corp., 285 A.D.2d 974, 728 N.Y.S.2d 618 (4th Dept. 2001))*; see also *Fairfield Fin. Mortg. Grp., Inc. v. Luca, No. 06-CV-5962 (JS)(WDW), 2014 U.S. Dist. LEXIS 130503, 2014 WL 4638950, at *14 (E.D.N.Y. Sept. 16, 2014)* ("[Defendant] also argues that the tort claims of conversion and accounting should be dismissed, because they arise from the same facts as the contract claims. **[*52]** I disagree. Plaintiffs are free to plead alternative causes of action, and these causes of action are distinct from the breach of the duty of loyalty claim, which arises directly from the contract itself. The plaintiff, if successful at trial, cannot collect damages for the same harm arising from different causes of action, but these claims can go to trial."); *Darlagiannis v. Darlagiannis, 48 A.D.2d 875, 875, 369 N.Y.S.2d 475 (2d Dept. 1975)* ("Even though plaintiff may have a legal remedy, she is not precluded from seeking equitable relief by way of an accounting predicated upon the existence of a fiduciary relationship."); cf. *Soley v. Wasserman, No. 08 CIV. 9262 KMW FM, 2013 U.S. Dist. LEXIS 153623, 2013 WL 5780814, at *1-2 (S.D.N.Y. Oct. 24, 2013)*, aff'd, *639 F. App'x 670 (2d Cir. 2016)* ("Plaintiff's request for an accounting after trial turns on whether the jury's verdict afforded Plaintiff an adequate remedy at law.").

Here, although Plaintiffs have been granted leave to amend their breach of contract and fraud claims, it is uncertain whether and to what extent these claims will survive. Accordingly, Plaintiffs will be granted leave to amend their accounting claim.

### III. **DEFENDANTS'** *RULE 11* **MOTION**

Defendants request that this Court issue a briefing schedule concerning their *Rule 11* motion for sanctions, which Judge Moses stayed "in light **[*53]** of the overlap in subject matter between that motion and defendants' fully-briefed motion to dismiss." (See Dkt. No. 60; Def. Obj. (Dkt. No. 79) at 13-16; Def. Reply (Dkt. No. 86) at

6-10) Defendants assert that their motion should be fully briefed in order to "preserve their right to recover attorney's fees and costs." (Def. Reply (Dkt. No. 86) at 6) Judge Moses recommends that Defendants' *Rule 11* motion "be administratively closed, without prejudice to reopening at the conclusion of this case." (R&R (Dkt. No. 79) at 46 n.24)

In seeking *Rule 11* sanctions, Defendants contend that Plaintiffs' claims have no merit, and are refuted by documents Defendants have submitted in connection with their motions to dismiss and for sanctions. (Def. Obj. (Dkt. No. 79) at 13-16; Def. Reply (Dkt. No. 86) at 6-10)

Defendants' *Rule 11* motion for sanctions will be denied without prejudice. Plaintiffs' case has survived a motion to dismiss. Moreover, the numerous documents Defendants submitted in support of their motion to dismiss are not properly before the Court, as explained above.

## CONCLUSION

The R&R (Dkt. No. 76) is adopted as set forth above. Defendants' motion to dismiss (Dkt. No. 44) is granted in part and denied in part, **[\*54]** as set forth above. Leave to amend is granted as set forth above. Defendants' motion for *Rule 11* sanctions (Dkt. No. 53) is denied without prejudice. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 44, 53)

Any motion for leave to file an amended complaint will be served and filed by **April 5, 2021**. The proposed Amended Complaint is to be attached as an exhibit to the motion.

Dated: New York, New York

March 22, 2021

SO ORDERED.

/s/ Paul G. Gardephe

Paul G. Gardephe

United States District Judge